SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

*Attorneys for Defendant*
**TWITTER, INC.**

[Additional counsel for each defendant are
included on the signature page.]

DAVID H. KRAMER (CA SBN 168452)
dkramer@wsgr.com
LAUREN GALLO WHITE (CA SBN 309075)
lwhite@wsgr.com
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California  94304
Telephone:    (650) 493-9300
Facsimile:     (650) 565-5100

*Attorneys for Defendant*
**GOOGLE INC.**

KRISTIN A. LINSLEY (CA SBN 154148)
kristin.linsley@mto.com
ROSEMARIE T. RING (CA SBN 220769)
rose.ring@mto.com
ANDREW RUBENSTEIN (CA SBN 295116)
andrew.rubenstein@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA  94105
Telephone:   (415) 512-4000
Facsimile:     (415) 512-4077

*Attorneys for Defendant*
**FACEBOOK, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| REYNALDO GONZALEZ, individually and as successor-in-interest of the ESTATE OF NOHEMI GONZALEZ., <br><br> Plaintiff, <br><br> v. <br><br> TWITTER, INC., GOOGLE INC., and FACEBOOK INC., <br><br> Defendants. | Case No. 4:16-cv-03282 <br><br> **NOTICE OF MOTION AND MOTION OF DEFENDANTS TWITTER, INC., GOOGLE INC., and FACEBOOK INC. TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Judge: Hon. Donna M. Ryu <br><br> [Fed. R. Civ. Proc. 12(b)(6)] <br><br> Hearing Date:  November 10, 2016 |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

NOTICE OF MOTION AND MOTION ............................................................................. 1

STATEMENT OF REQUESTED RELIEF ......................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 2

FACTUAL BACKGROUND ............................................................................................... 4

LEGAL STANDARDS ON A MOTION TO DISMISS .................................................... 8

ARGUMENT ........................................................................................................................ 8

I.     Section 230 Requires Dismissal Of Plaintiff's Claims ........................................ 9

     A.    Section 230 Immunizes Internet Platforms Such As Twitter, Google, And Facebook From Civil Liability For Content Created By Third-Party Users .......... 9

     B.    Section 230 Immunizes Defendants Against Plaintiff's Claims ......................... 11

          1.    Defendants Are Providers Of Interactive Computer Services ................... 11

          2.    The Allegedly Harmful Content At The Core Of Plaintiff's Claims Was Provided By Third-Parties ................................................................ 11

          3.    The Complaint Is Based On Twitter, Google, and Facebook's Alleged Publishing Conduct With Respect To This Third-Party Content .............. 13

II.    The Complaint Fails To State A Claim Under Section 2333 ............................... 16

     A.    The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook Proximately Caused the Death of Ms. Gonzalez ................ 16

     B.    The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook Committed An "Act Of International Terrorism" .............. 20

          1.    The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook Knowingly Provided Material Support To ISIS .................................................................................................... 21

          2.    The Complaint Fails To Allege Facts Plausibly Establishing That Any Defendant's Conduct Involved Violent or Dangerous Acts That "Appear[ed] To Be Intended" To Achieve Specified Terrorist Purposes .. 24

CONCLUSION ..................................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abecassis v. Wyatt*, 704 F. Supp. 2d 623 (S.D. Tex. 2010) ........................................21

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2012) ...................................................................................................................20

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .............................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................8, 18, 20, 21

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)................2, 10, 11, 14, 15, 16

*Barrett v. Rosenthal*, 51 Cal. Rptr. 3d 55 (Cal. 2006) ...............................................12

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003).............................................................9

*Boim v. Holy Land Found. for Relief & Develop.*, 549 F.3d 685 (7th Cir. 2008) (en banc)...........................................................................................17, 20, 24, 25

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003) (*Burnett I*)...........................................................................................................22

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)........................10, 11

*Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085 (N.D. Cal. 2014) ......................8

*Coto Settlement v. Eisenberg*, 593 F.3d 1031 (9th Cir. 2010) .....................................7

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) .......................................................17

*Crandon v. United States*, 494 U.S. 152 (1990) .........................................................22

*Doe v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016) .....................................10, 13, 14, 15

*Doe v. Internet Brands, Inc.*, No. 12-56638, 2016 WL 3067995 (9th Cir. May 31, 2016) ..................................................................................................................10

*Doe v. MySpace*, 528 F.3d 413 (5th Cir. 2008) ..........................................................14

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc)..............................................2, 9, 10, 12, 13

*Fields v. Twitter, Inc.*, 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) ................. *passim*

*Gentry v. eBay Inc.*, 99 Cal. App. 4th 816 (Cal. Ct. App. 2002) .......................................13

*Goddard v. Google, Inc.*, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008).....................................13

*Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010) ............................................17, 20

*Hinton v. Amazon.com.dedc*, 72 F. Supp. 3d 685 (S.D. Miss. 2014)............................................13

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ......................................................20, 22

*Holmes v. Secur. Inv. Protection Corp.*, 503 U.S. 258 (1992) ......................................................17

*In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049 (9th Cir. 2008) .........................................................8

*In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963
(N.D. Cal. Sept. 20, 2011) .................................................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005)
(*Burnett II*) .....................................................................................................8, 24, 25

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013) (*Al Rajhi
Bank*) ....................................................................................16, 17, 18, 19, 20

*Jones v. Dirty World Entm't Recordings*, 755 F.3d 398 (6th Cir. 2014) .......................................12

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) .......................................................10, 14

*Lancaster v. Alphabet Inc.*, No. 15-CV-05299-HSG, 2016 WL 3648608 (N.D.
Cal. July 8, 2016) ..............................................................................................................11

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015)............................................17, 25

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041 (E.D. Mo.
2011) ..................................................................................................................................13

*Mattel v. MGA Entm't*, 782 F. Supp. 2d 911 (C.D. Cal. 2011)....................................................17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009)....................10

*Papasan v. Allain*, 478 U.S. 265 (1986) ........................................................................................8

*Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902 (N.D. Cal. 2015) .................................................8

*Riehle v. Bank of Am., N.A.*, No. CV-13-00251-PHX-NVW, 2013 WL 1694442
(D. Ariz. Apr. 18, 2013)......................................................................................................5

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ...............................................8, 16, 17, 19, 20

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088 (N.D. Cal. 2015) .................................................................................................................11

*Stansell v. BGP, Inc.*, 2011 WL 1296881 (M.D. Fla. Mar., 31, 2011) .........................................24

*Staples v. United States*, 511 U.S. 600 (1994) ...........................................................22

*Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June 30, 2006) ...............................................................21, 23, 25

*Universal Commc'n Sys. v. Lycos*, 478 F.3d 413 (1st Cir. 2007) .............................................12, 15

*Yu v. Design Learned, Inc.*, No. 15-CV-05345-LB, 2016 WL 1621704 (N.D. Cal. Apr. 22, 2016) ...............................................................................................5

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)..................................................9, 10, 12

## CONSTITUTIONAL AND STATUTORY PROVISIONS

First Amendment ...............................................................................................19, 20, 23

15 U.S.C. § 15(a) ..............................................................................................17

18 U.S.C. § 1964(c) (1970)..................................................................................17

18 U.S.C. § 2331 ...........................................................................................4, 20, 24, 25

18 U.S.C. § 2333 ...................................................................................... *passim*

18 U.S.C. § 2339A ................................................................................... *passim*

18 U.S.C. § 2339B ................................................................................... *passim*

47 U.S.C. § 230................................................................................... *passim*

26 Stat. 209 (1890)...............................................................................17

## RULES

Federal Rule of Civil Procedure 12(b)(6) ....................................................................1, 8

<u>**NOTICE OF MOTION AND MOTION**</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 10, 2016, at 11:00 a.m. in Courtroom 4, 3rd Floor, United States District Court for the Northern District of California, Oakland Courthouse, 1301 Clay Street, Oakland, California, Defendants Twitter, Inc. ("Twitter"), Google, Inc. ("Google"), and Facebook, Inc. ("Facebook") (collectively "Defendants") shall and hereby do move for an order dismissing with prejudice all claims advanced by Plaintiff Reynaldo Gonzalez ("Plaintiff") in the present case.  This motion is supported by the following Memorandum of Points and Authorities and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

**STATEMENT OF REQUESTED RELIEF**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Twitter, Google, and Facebook request that the Court dismiss with prejudice all of Plaintiff's claims.

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether 47 U.S.C. § 230 ("Section 230"), which broadly immunizes online intermediaries from liability for harms from third-party content, bars this action, which seeks to impose liability under 18 U.S.C. § 2333(a) based on allegations that Defendants failed to block or remove, and/or generated and/or shared revenue from, content that ISIS affiliates allegedly transmitted via Defendants' online communications platforms.

2. Whether the Complaint fails to state a claim under 18 U.S.C. § 2333(a) ("Terrorism Civil Remedy provision" or "Section 2333") because:

   a. The Complaint fails to allege facts that would establish that any Defendant proximately caused Nohemi Gonzalez's death;

   b. The Complaint fails to allege facts that would establish that any Defendant knowingly provided material support to ISIS; and

   c. The Complaint fails to allege facts that would establish that any Defendant's conduct involved "violent acts or acts dangerous to human life" that "appear to [have] be[en] intended" to achieve one of the statutorily-specified terrorist purposes.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2       Plaintiff's Complaint seeks to hold Twitter, Google, and Facebook liable for the death of

3   Nohemi Gonzalez, who was killed in the horrific November 13, 2015 terrorist attacks in Paris,

4   for which the Islamic State of Iraq and Syria ("ISIS") has claimed responsibility.  Defendants

5   have profound sympathy for Plaintiff's loss.  But there is no legal basis for holding Twitter,

6   Google, or Facebook liable for the crimes claimed to have been committed by ISIS.

7       This was precisely the holding of this Court last month in *Fields v. Twitter, Inc.*, 2016

8   WL 4205687 (N.D. Cal. Aug. 10, 2016), which dismissed a nearly identical suit filed against

9   Twitter.  In *Fields*, Judge Orrick correctly held that such claims were barred by Section 230 of

10  the Communications Decency Act, 47 U.S.C. § 230.  The same result is warranted here.  As in

11  *Fields*, the Complaint in this case does not allege any meaningful connection between the

12  Defendants and either the Paris attack or any of the attackers.  Nor does it allege that Defendants

13  created any of the Tweets, messages, videos, or other content that the Complaint strains to link,

14  even indirectly, to that attack.  Instead, the Complaint seeks to hold Defendants liable solely on

15  the ground that their broadly available online communications platforms, which have billions of

16  users worldwide, allegedly were used by certain terrorists or terrorism sympathizers (though not

17  the attackers in Paris) to transmit information promoting their views and activities.  Plaintiff

18  claims that 18 U.S.C. § 2333(a) makes Defendants liable for the speculative consequences of this

19  user-created content—including Ms. Gonzalez's death—because they allegedly failed to block or

20  remove that content from their platforms.  Under the flawed logic of the Complaint, Defendants

21  would be guilty of the federal crime of providing material support to terrorists and theoretically

22  could be liable for every attack for which ISIS—or any other terrorist group—claims

23  responsibility or is credited with having inspired.

24      Plaintiff's attempt to hold Defendants civilly liable for the alleged consequences of third-

25  party content shared through their online platforms is exactly the type of claim that courts

26  throughout the country, including the Ninth Circuit, have held to be barred by Section 230.  *E.g.*,

27  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th

28  Cir. 2008) (en banc); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).   As Judge

Orrick ruled in dismissing the virtually identical claims asserted in *Fields*, suits of this sort inevitably fall within the broad protective ambit of Section 230 because they seek to hold interactive computer service providers liable for disseminating or failing to block or remove objectionable content created by their users, thereby impermissibly "treat[ing] [them] as the publisher" of information provided by others.  47 U.S.C. § 230(c)(1).  And that result is not changed by Plaintiff's new allegations that Defendants earned revenue from advertisements posted in some proximity to ISIS-related content.  As every court to consider the question has concluded, Internet service providers do not lose Section 230 immunity simply because they earn revenues from the dissemination of user-generated content.  In sum, both the rationale of *Fields* and the two decades of prior precedent construing Section 230 to provide robust immunity for online platforms like the Defendants' require dismissal here.

Even if Section 230 did not exist, the Complaint still would have to be dismissed because it fails to state a claim for relief under the strict terms of the Terrorism Civil Remedy provision.  That provision requires, among other things, that a plaintiff allege and prove (1) that he or she was injured "by reason of"—i.e., that his or her injuries were proximately caused by—(2) an "act of international terrorism" committed by the defendant.  18 U.S.C. § 2333(a).  Judge Orrick addressed the first of these requirements in *Fields*, holding that the plaintiffs had failed adequately to plead proximate causation.  *See* 2016 WL 4205687 at \*8-\*9.  As in *Fields*, Plaintiff here "do[es] not allege that ISIS recruited or communicated with [the attackers] over [Defendants' platforms], that ISIS or [the attackers] used [Defendants' platforms] to plan, carry out, or raise funds for the attack, or that [the attackers] ever viewed ISIS-related content on [Defendants' platforms] or even had a[n] … account [on those platforms]." *Id.* at \*1.  Instead, Plaintiff alleges only that Defendants failed to prevent some individuals allegedly affiliated with ISIS from using their broadly available Internet services and that some other individuals also allegedly affiliated with ISIS carried out the attack.  Under any standard, the "causal connection[]" between the alleged use of Defendants' services and the attack is "too speculative [and] attenuated to raise a plausible inference of proximate causation." *Id.* at \*9 n.4.

Nor does the Complaint allege facts supporting a plausible conclusion that any Defendant

committed an act of "international terrorism," as defined in 18 U.S.C. § 2331(1). Section 2333(1)(A) requires (among other elements) that the defendant's conduct have violated a federal or state criminal law. To satisfy this requirement, Plaintiff contends that because individuals affiliated with ISIS purportedly used Defendants' services, Defendants thereby provided "material support" for terrorism in violation of 18 U.S.C. § 2339A and § 2339B. This theory fails. Both those criminal statutes require that the defendant have had actual and specific knowledge that it was aiding a specified type of terrorist activity or a designated foreign terrorist organization. But Plaintiff alleges, at most, that Defendants generally knew that some of their platforms' billions of users might be affiliated with or sympathetic to ISIS. That is not enough.

The Complaint also fails to allege conduct by any Defendant that would satisfy other necessary elements of the multi-part statutory definition of "international terrorism." Plaintiff's allegations, even if true, would establish little more than that Defendants made their online platforms broadly available and failed to police those platforms as Plaintiff would like. That conduct plainly does not constitute a "violent act[]" or act "dangerous to human life" that "appear[s] to [have been] intended" "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1)(A), (B).

As in *Fields*, the Complaint in this case must be dismissed. And because any amendment would be futile, the dismissal should be with prejudice.

## FACTUAL BACKGROUND

According to the Complaint, on November 13, 2015, Nohemi Gonzalez was killed during a terrorist attack in Paris. Compl., Dkt. No. 1, ¶¶ 110-112. ISIS "claimed responsibility for the attacks." *Id.* ¶ 113. The United States has designated ISIS as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. *Id.* ¶ 19.[1]

---

[1] Although Defendants treat the allegations in the Complaint as true solely for purposes of this motion, Defendants object to Plaintiff's impermissible use of "group pleading," through which the Complaint repeatedly refers collectively to "Defendants" when the specific allegations pertain to only one of them. "Under Rule 8(a), grouping multiple defendants together in a broad

Defendants Twitter, Google (through its YouTube service), and Facebook each operate global Internet platforms for public self-expression and conversation that are free of charge and broadly available for use.  *See* Compl. ¶ 1.  Each day, users of these platforms send and post hundreds of millions of Tweets, videos, and messages touching on a broad range of topics—from the presidential election to a favorite sports team to the birth of a child.  *Id.* ¶ 90.

The Complaint does not allege that Defendants had anything to do with the Paris attacks or that their platforms were ever used by any of the attackers.  The Complaint does not allege that ISIS recruited the Paris attackers over Twitter, YouTube, or Facebook, or that the attackers or ISIS used these platforms to plan, carry out, or raise money for the attacks.  It does not even allege that the attackers had accounts with Defendants or ever accessed their services.

Instead, the sole alleged connection is that some of Defendants' billions of account-holders allegedly are affiliated with or sympathetic to ISIS and used Defendants' platforms to transmit content promoting ISIS's activities and agenda.  As for Twitter, the Complaint alleges that affiliates or supporters of ISIS used Twitter to send messages to recruit terrorists, *id.* ¶¶ 21-26, raise funds, *id.* ¶¶ 32-35, and spread propaganda, *id.* ¶¶ 41-51.  The Complaint asserts, for example, that ISIS or "ISIS supporters" tweeted images of executions, *id.* ¶¶ 42-48, and guidelines about how to join ISIS, *id.* ¶ 23.  The Complaint admits that Twitter has repeatedly shut down accounts opened by allegedly "pro-ISIS" users.  *Id.* ¶ 93.

As for YouTube/Google, the Complaint identifies four videos that allegedly appeared on YouTube, *id.* ¶¶ 24, 37, 51, 72, one of which it acknowledges YouTube removed, *id.* ¶ 24.  The Complaint alleges that, through these videos, ISIS used YouTube to recruit terrorists.  *Id.* ¶¶ 24,

---

allegation is insufficient to provide the defendants with fair notice of the claims against them and the grounds for relief."  *Yu v. Design Learned, Inc.*, No. 15-CV-05345-LB, 2016 WL 1621704, at *4 (N.D. Cal. Apr. 22, 2016); *accord Riehle v. Bank of Am., N.A.*, No. CV-13-00251-PHX-NVW, 2013 WL 1694442, at *2 (D. Ariz. Apr. 18, 2013); *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011).  In fact, Plaintiff's Complaint copies verbatim large swaths of the dismissed Complaint in *Fields*, merely substituting the word "Defendants" for "Twitter."  *Compare, e.g.*, Compl. ¶¶ 31-51, *with Fields*, No. 3:16-cv-00213-WHO, Dkt. 1 ¶¶ 25-51.

72.  The Complaint also cites a series of news articles referencing alleged "ISIS videos" posted to YouTube.  *Id.* ¶¶ 70-80.  The complaint identifies two other videos that were "posted," but does not specify whether they were posted on any of Defendants' sites.  *Id.* ¶¶ 25, 40.

As for Facebook, the Complaint identifies a handful of alleged ISIS *sympathizers* who allegedly posted on Facebook, *id.* ¶¶ 65-68, such as "a known ISIS terror group *fan page*" that "adoringly quote[d]" an ISIS leader, *id.* ¶ 63.  It also alleges that "ISIS *supporters*" directed users to Facebook pages containing ISIS propaganda.  *Id.* ¶ 64.  Plaintiff acknowledges that these pages were being "continuously … removed by Facebook for content violation."  *Id.*  The Complaint alleges four instances in which ISIS members used Facebook, *id.* ¶¶ 27-29, 72, although Plaintiff fails to allege—as with all of his allegations regarding content that allegedly appeared on any of the Defendant's platforms—how these four examples were connected in any way to the Paris attacks.

All of the online content, referenced throughout the Complaint, was created entirely by third parties—specifically, by alleged terrorists and their allies, and not by Defendants.  The Complaint nonetheless seeks to hold Defendants liable for the asserted (and attenuated) consequences of this content based on two theories.

*First*, the Complaint asserts that Defendants "knowingly permitted" ISIS to share this content, Compl. ¶ 1, and allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," Compl. ¶¶ 52, 90, 93; *see also id.* ¶ 63, 64, 71.  Notably, the rules that each Defendant has prescribed to govern what information individuals may transmit through their online platforms unequivocally ban content that encourages violence of any kind, including terrorism.[2]  The Complaint alleges, without support, that Defendants

---

[2] Twitter has always banned "threats" and use of the platform "for any unlawful purposes or in furtherance of illegal activities" and, for the sake of clarity, has since April 2015 made the ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism."  The Twitter Rules, *available at* https://support.twitter.com/articles/18311# (last visited Sept. 2, 2016).  YouTube removes "videos that encourage others to do things that might cause them to get badly hurt," "gory content that … encourage[s] others to

enforced these rules primarily by reviewing and removing content, and by blocking accounts, when notified of a violation. *See id.* ¶¶ 71, 90. According to Plaintiff, this approach was not good enough: Defendants instead should have "proactively" and pre-emptively "delete[d]" accounts "as soon as they [were] created," *id.* ¶ 95, and "monitor[ed] [the] content" sent by hundreds of millions of users via their platforms each day, *id.* ¶ 90.

*Second*, the Complaint alleges that Defendants earn revenue from advertisements placed on their platforms, including ads that allegedly appeared near "ISIS postings," Compl. ¶¶ 99-109, and also alleges that Defendant Google allows revenue earned in connection with some YouTube videos to be shared with the users who upload them—an alleged practice that the Complaint speculates resulted in the "shar[ing of] some of those revenues with ISIS," *id.* ¶¶ 100-105.

Based on these allegations, Plaintiff seeks treble money damages from Twitter, Google, and Facebook under the Terrorism Civil Remedy provision, 18 U.S.C. § 2333(a). Compl. ¶ 123. Count I asserts that Defendants "purposefully, knowingly or with willful blindness" provided "services and support" to ISIS, that those "services and support … constitute material support to the preparation and carrying out of acts of international terrorism," that providing such material support "was a proximate cause" of the death of Ms. Gonzalez, that Defendants thereby violated 18 U.S.C. § 2339A, and that "[b]y virtue of [their] violations of 18 U.S.C. § 2339A, [Defendants] are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiff has sustained." *Id.* ¶¶ 115-118. Count II repeats these allegations with respect to 18 U.S.C. § 2339B, asserting that Defendants "purposefully, knowingly or with willful blindness" provided

commit specific acts of violence," content "inciting others to commit violent acts," and promotions of "violence against individuals based on race or ethnic origin, religion, … [or] nationality." YouTube Community Guidelines, https://www.youtube.com/yt/policyandsafety /communityguidelines.html (last visited Sept. 2, 2016). Facebook bars organizations engaged in "terrorist activity," and "remove[s] content that expresses support for groups that are involved in violent or criminal behavior," including content "[s]upporting or praising leaders of those same organizations, or condoning their violent activities." Facebook Community Standards, *available at* https://www.facebook.com/communitystandards# (last visited Sept. 2, 2016). These rules are incorporated by reference into the Complaint because it "necessarily relies upon" and quotes portions of them (¶¶ 66, 70, 101), there is no basis to question their authenticity, and they are relevant. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

material support to ISIS, a Foreign Terrorist Organization.  *Id.* ¶¶ 119-122.

## LEGAL STANDARDS ON A MOTION TO DISMISS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A claim is plausible on its face only if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 913 (N.D. Cal. 2015) (quoting *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).  Nor is the court "bound to accept as true a legal conclusion couched as a factual allegation." *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1093 (N.D. Cal. 2014) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Given "'the extreme nature of the charge of terrorism,'" it is especially important in an action brought under Section 2333 that the Court ensure that the plaintiff has satisfied these basic pleading requirements.  *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013) (*Burnett II*); *see also Rothstein v. UBS AG*, 708 F.3d 82, 93-98 (2d Cir. 2013).  In such an action, "'fairness requires extra-careful scrutiny of Plaintiff's allegations.'"  *Burnett II*,  349 F. Supp. 2d at 831.

## ARGUMENT

Two independent legal grounds require dismissal here.  *First*, as in *Fields*, Section 230 bars claims, such as those alleged here, that seek to hold Defendants liable for injuries allegedly resulting from third-party content on their online platforms.  *Second*, the Complaint fails to plead facts that establish three key elements of the Plaintiff's claims under the Terrorism Civil Remedy provision: (1) that Defendants' own conduct proximately caused the death of Ms. Gonzalez as required by Section 2333 (a dispositive defect also identified in *Fields*); (2) that in providing their services, Defendants specifically knew they were providing "material support" to ISIS, as

per the federal criminal statutes (18 U.S.C § 2339A and § 2339B) that Plaintiff invokes in alleging that Defendants committed "act[s] of international terrorism"; and (3) that Defendants' conduct satisfies the multi-part statutory definition of "international terrorism," including that the alleged conduct appears to have been intended to achieve one of three specific terrorist purposes set out in the statutory definition of "international terrorism" (*id.* § 2331(1)(B)).

## I.      Section 230 Requires Dismissal Of Plaintiff's Claims

Section 230 bars any cause of action that seeks to hold a provider of interactive computer services liable for content created by a third party, or for the service provider's decisions or activities relating to allowing, removing, or altering that content.  The Complaint seeks to do precisely that:  it alleges that Defendants should be held liable for the attack that killed Ms. Gonzalez because individuals affiliated with or supporting ISIS allegedly disseminated extremist content through their platforms and Defendants failed to sufficiently censor that content.  No amount of artful pleading can change the fact that Plaintiff seeks to hold Defendants liable for publishing—and allegedly failing to take action against—objectionable third-party content.  As in *Fields*, Section 230 forbids such claims and requires dismissal of the Complaint.

### A.      Section 230 Immunizes Internet Platforms Such As Twitter, Google, And Facebook From Civil Liability For Content Created By Third-Party Users

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  As the Ninth Circuit has explained, this provision "immunizes providers of interactive computer services against liability arising from content created by third parties."  *Roommates.com*, 521 F.3d at 1162; *accord Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("§ 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.").

Because Section 230 prohibits claims that treat providers of interactive computer services as "publisher[s]" of third-party content, it bars any claim that turns on whether or to what extent a service provider exercised a "traditional editorial function" with respect to the torrent of third-party content that flows through its networks.  *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th

Cir. 2003).  That includes any claim based on the provider's "efforts, or lack thereof, to edit, monitor, or remove user generated content."  *Doe v. Internet Brands, Inc.*, No. 12-56638, 2016 WL 3067995, at *5 (9th Cir. May 31, 2016).  Whether the material is unlawfully discriminatory, *Roommates.com*, 521 F.3d at 1173-1174, false and defamatory, *Zeran*, 129 F.3d at 330, a vile and lawless advertisement posted by sex traffickers, *Doe v. Backpage.com*, 817 F.3d 12, 21 (1st Cir. 2016), or an abhorrent and explicit incitement to violence by a terrorist group, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356-1357 (D.C. Cir. 2014), Section 230 immunity attaches "at the earliest possible stage of the case," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).[3]

Given the expansive reach of Section 230, as well as the important interests at stake, courts across the country "have treated § 230(c) immunity as quite robust."  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).  Under the statute, service providers such as Twitter, Google, and Facebook are protected against any cause of action arising from third-party content, including in their exercise of traditional editorial functions, "such as deciding whether to publish, withdraw, postpone, or alter content."  *Zeran*, 129 F.3d at 330.

Judge Orrick's decision in Fields exemplifies how Section 230 works and is on all fours with this case.  The *Fields* plaintiffs alleged in nearly identical terms that Twitter provided material support to ISIS and that this material support proximately caused plaintiffs' injuries.  As here, the *Fields* plaintiffs sought to hold Twitter liable for those injuries under Section 2333. Looking through the specific third-party content and the particular legal theory plaintiffs alleged, Judge Orrick dismissed the suit on Section 230 grounds because plaintiffs' claims sought to hold Twitter liable based on how Twitter performed a quintessential publisher function—deciding what third-party content may be posted online.  *See Fields*, 2016 WL 4205687, *5-*8.

---

[3] Section 230 requires dismissal where, as here, the defendant's entitlement to immunity "is evident from the face of the complaint."  *Klayman*, 753 F.3d at 1357; *see also Barnes*, 570 F.3d at 1105-1106 (affirming, in part, dismissal on Section 230 grounds); *Roommates.com*, 521 F.3d at 1175 (Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     Section 230 Immunizes Defendants Against Plaintiff's Claims**

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content at issue was "provided by another information content provider," and not the defendant; and (3) the plaintiff is seeking to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see also Barnes*, 570 F.3d at 1100-1101.  Each of these elements is satisfied here.

**1.     Defendants Are Providers Of Interactive Computer Services**

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).  Defendants' open Internet platforms satisfy this broad definition because users access their servers to share information with others.  *See* Compl. ¶ 1 (describing Defendants' platforms as "social networks"); *Fields*, 2016 WL 4205687, *4  (no dispute that Twitter is an interactive computer service); *Lancaster v. Alphabet Inc.*, No. 15-CV-05299-HSG, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016) (finding that YouTube and Google are interactive computer services);  *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1093 (N.D. Cal. 2015) (same for Facebook).

**2.     The Allegedly Harmful Content At The Core Of Plaintiff's Claims Was Provided By Third Parties**

The second element—that the challenged content be provided by third parties—is also easily met.  "[S]o long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process."  *Carafano*, 339 F.3d at 1124.  Here, the Complaint does not allege that Defendants played any part in the "creation or development" of any of the challenged ISIS-related content.  Indeed, it admits that all of the objectionable material was created and posted by third-party users—namely persons associated with, or inspired by, "the terrorist group ISIS."  Compl. ¶ 1; *see also, e.g.*, *id.* ¶¶ 2-5, 19, 30, 35.  Because all of the content was "provided by another information content provider," 47 U.S.C. § 230(c)(1), it falls squarely within Section 230.

As Judge Orrick made clear in *Fields*, this conclusion holds true even though Defendants

offer their subscribers neutral tools to create, promote, and discover online content, and encourage users to choose their platforms to publish content. *See* 2016 WL 4205687 at *7 (Section 230 applies to "Twitter's decisions [about how] to structure and operate itself as a 'platform'"). For example, Twitter users can include hashtagged keywords (#) in their Tweets to promote a message to other users interested in the same topic, as well as to facilitate searching for information on the keyword topic. *E.g.*, Compl. ¶¶ 43, 47. But whatever their form, "*neutral* tools," even if used "to carry out what may be unlawful or illicit" activities, do not affect Section 230 immunity. *Roommates.com*, 521 F.3d at 1169; *see also Jones v. Dirty World Entm't Recordings*, 755 F.3d 398, 416 (6th Cir. 2014) (neutral tools "do not constitute a material contribution to any defamatory speech that is uploaded"). Indeed, "absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful *purposes*," the provision of neutral tools "is fully protected by CDA immunity." *Roommates.com*, 521 F.3d at 1174 n.37 (emphasis added). Plaintiff nowhere alleges that any of the neutral tools that Defendants offer to enable and encourage the publication of third-party content on their platforms shaped the *substance* of the allegedly harmful content at issue here.

Section 230 immunity also attaches whether or not Defendants knew of the objectionable content. "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Universal Commc'n Sys. v. Lycos*, 478 F.3d 413, 420 (1st Cir. 2007); *accord Roommates.com*, 521 F.3d at 1169 n.24 (Section 230 prohibits lawsuits based on "passive acquiescence in the misconduct of [third-party] users"). Notice-based liability "would defeat the dual purposes advanced by § 230 of the CDA," *Zeran*, 129 F.3d at 333, namely "discourag[ing] active monitoring of Internet postings," and "allow[ing] complaining parties to impose substantial burdens on the freedom of Internet speech by lodging complaints whenever they were displeased by an online posting," *Barrett v. Rosenthal*, 51 Cal. Rptr. 3d 55, 73 (Cal. 2006). Accordingly, Section 230 applies "even after notice of the potentially unlawful nature of the third-party content." *Lycos*, 478 F.3d at 420.

Plaintiff's allegation that Defendants derived ad revenue from the posts at issue—one of the few new allegations Plaintiff added to those in the *Fields* amended complaint—also does not

affect the Section 230 inquiry.  The "fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content."  *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) (rejecting argument that Section 230 did not apply because Google received ad revenue from user-generated content); *see also Hinton v. Amazon.com.dedc*, 72 F. Supp. 3d 685, 690 n.9 (S.D. Miss. 2014) (Section 230 immunity is not affected by the operator's receipt of profits from online sales).  No other interpretation of Section 230 would make sense.  Websites that disseminate user-created content are able to operate precisely because they are able to generate revenue from their platforms.  To hold that a website thereby loses Section 230 immunity "would be to create a for-profit exception to § 230's broad grant of immunity."  *M.A. ex rel. P.K. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011); *see also Roommates.com*, 521 F.3d at 1174-1175 (affirming immunity with respect to user-supplied content, even though the website profited "by collecting revenue from advertisers and subscribers"); *Backpage.com*, 817 F.3d at 24, 26 (affirming immunity, even though the website allegedly "garner[ed] advertising revenues from [victims'] traffickers [and] profited from the unauthorized use of [victims'] photographs"); *Gentry v. eBay Inc.*, 99 Cal. App. 4th 816, 822, 828-31 (Cal. Ct. App. 2002) (same, even though eBay received placement fees from auction item listings).

### 3.   The Complaint Is Based On Twitter, Google, and Facebook's Alleged Publishing Conduct With Respect To This Third-Party Content

Finally, Section 230 immunity applies here because Plaintiff seeks to hold Defendants liable as the "publisher or speaker" of the content at issue.  The Complaint alleges that Defendants are liable for the attack that killed Ms. Gonzalez because they "knowingly *permitted*" ISIS or its allies to use their platforms to spread propaganda, raise funds, and recruit followers, Compl. ¶ 1 (emphasis added), and allegedly failed to take "meaningful action to stop it" by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up," *id.* ¶¶ 52, 70, 90, 93.  This is "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230."  *Roommates.com*, 521 F.3d at 1171-1172 (rejecting effort to hold service provider liable for

"failing to detect and remove" unlawful content); *Barnes*, 570 F.3d at 1103 ("removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove"); *Backpage.com*, 817 F.3d at 21 (same); *see also Klayman*, 753 F.3d at 1355, 1358, 1359 (rejecting attempt to impose liability for "allowing … Third Intifada pages"—which "called for Muslims to rise up and kill the Jewish people"—"to exist on its website," and for "'refus[ing]' to 'take down the page[s],'" (quoting complaint)).  Indeed, Judge Orrick reached exactly that conclusion in *Fields* in dismissing the amended complaint on which the Complaint in this case is modeled.  The result should be no different here.

Plaintiff tries to avoid this conclusion by asserting—contrary to every other allegation and theory alleged in the Complaint—that his claims arise solely from Defendants' "provision of the infrastructure which provides material support to ISIS," and have nothing to do with the "content of ISIS' social media postings."  Compl. ¶ 8.  This argument is analytically identical to an argument by the plaintiffs in *Fields*—namely, that their case rested on Twitter's "provision of accounts" to ISIS and not on the content of ISIS tweets or on Twitter's failure to block or remove such tweets.  Judge Orrick rejected that argument, and his thorough reasoning also compels rejection of Plaintiff's "infrastructure" theory here.  *See Fields*, 2016 WL 4205687 at *5-*9.

*First*, Judge Orrick explained that the "provision of accounts" theory did not accurately describe the amended complaint in *Fields*, which was "riddled with detailed descriptions of ISIS-related messages, images, and videos."  *See* 2016 WL 4205687 at *6.  That is equally true of the Complaint here, most of which is copied verbatim or nearly verbatim from the original *Fields* complaint.  Moreover, as the Ninth Circuit and other courts have repeatedly explained, artful pleading cannot circumvent Section 230 immunity.  *See Barnes*, 570 F.3d at 1102-1103; *Backpage.com*, 817 F.3d at 19-20; *Doe v. MySpace*, 528 F.3d 413, 419-420 (5th Cir. 2008). Rather, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another."  *Barnes*, 570 F.3d at 1101-1102; *see also Fields*, 2016 WL 4205687 at *4.  Plaintiff thus cannot avoid immunity by styling Defendants' editorial conduct and provision of neutral tools as the "provision of the

infrastructure which provides material support to ISIS," Compl. ¶ 8; *see also id.* ¶ 22, 60, 66, 88,
92.  As in *Fields*, the entire premise of Plaintiff's claims is that ISIS or its affiliates or supporters
used Defendants' services to spread its hateful message, and that Defendants should have taken
more aggressive steps to eliminate such harmful content.  Such claims by definition treat
Defendants as the "publisher" of the content at issue—exactly what Section 230(c)(1) forbids.
*See Barnes*, 570 F.3d at 1103 (immunity extends to "'any activity that can be boiled down to
deciding whether to exclude material that third parties seek to post online.'").

　　*Second*, Judge Orrick held that even if the *Fields* plaintiffs could have pled a "provision
of accounts" theory, Section 230 still would mandate dismissal because such a theory necessarily
involves protected publishing decisions, including "the decision to permit third parties to post
content."  *Fields*, 2016 WL 4205687 at *6.  As Judge Orrick made clear, and as other courts have
recognized, "decisions regarding the 'structure and operation' of a [defendant's] website," are no
less publisher choices than the decision whether to withdraw or alter content.  *Id.* at *7 (quoting
*Backpage.com*, 817 F.3d at 20-21).  The First Circuit has applied Section 230 to a service
provider's decisions to grant users "the option to anonymize e-mail addresses," *id.*, or "accept[]
anonymous payments," *id.*, or "register[] under multiple screen names," *Lycos*, 478 F.3d at 420,
and Judge Orrick applied Section 230 to Twitter's alleged provision of accounts to users
affiliated with ISIS, *Fields*, 2016 WL 4205687 at *6, because such decisions "reflect choices
about what content can appear on the website," *Backpage.com*, 817 F.3d at 21.

　　*Third*, Judge Orrick held that the *Fields* plaintiffs could not avoid relying on third-party
content because any hope they had of satisfying the causation element of Section 2333 depended
on such content.  *See* 2016 WL 4205687 at *8-*9.  This rationale also applies here.  To hold
Defendants liable under Section 2333, Plaintiff would have to establish that their actions
proximately caused Ms. Gonzalez's death.  Although it is clear that Plaintiff cannot satisfy that
requirement no matter what his allegations might be (*see infra* 16-20), the only conceivable hook
would be that ISIS-related *content* supposedly was transmitted via Defendants' platforms and
that Defendants allegedly made (or failed to make) publishing decisions relating to that content.
*See* Compl. ¶ 1 (alleging that Defendants "knowingly permitted" ISIS to use their platforms "as a

tool for *spreading extremist propaganda*, *raising funds* and *attracting new recruits*" (emphasis added)); *Fields*, 2016 WL 4205687 at \*8 (holding that "[t]he only arguable connection" between Twitter and the attack was "based on specific content disseminated through Twitter").

Apart from the content of specific postings, the Complaint alleges no other basis for speculating that Defendants' platforms supported ISIS in any way.  Indeed, if Plaintiff's claims were premised merely on the allegation that Defendants provided "infrastructure" to ISIS, and not on any allegation that ISIS *used* that infrastructure to transmit messages and videos aimed at recruiting new members, raising funds, or spreading its extremist agenda, Plaintiff could not remotely claim that Defendants "ha[ve] been instrumental to the rise of ISIS," Compl. ¶ 1, much less that they proximately caused the Paris attack.  Because Plaintiff's claims "inherently require[] the court to treat [Defendants] as the 'publisher or speaker' of content provided by another," the immunity provided by Section 230 applies.  *Barnes*, 570 F.3d at 1101-1102.

## II.    The Complaint Fails To State A Claim Under Section 2333

The Complaint must be dismissed for a second, independent reason:  It fails to state a claim for relief under the Terrorism Civil Remedy provision, the sole legal basis for both of Plaintiff's claims.  This provision creates a private cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  By its terms, this provision requires a plaintiff to plead and prove (1) that he or she was injured "by reason of"—i.e., that the injury was proximately caused by—(2) an "act of international terrorism" committed by the defendant.  Plaintiff's Complaint fails to allege facts that would plausibly establish either of these elements.

### A.    The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook Proximately Caused the Death of Ms. Gonzalez

Section 2333's "'by reason of' language … restricts the imposition of … liability [under the statute] to situations where plaintiffs plausibly allege that defendant's actions proximately caused their injuries."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-125 (2d Cir. 2013) (*Al Rajhi Bank*) (affirming a 12(b)(6) dismissal for failure plausibly to allege proximate cause); *Rothstein v. UBS AG*, 708 F.3d 82, 95-97 (2d Cir. 2013) (same).  Congress borrowed this

proximate-cause requirement from the civil remedy provisions of the Sherman Act, 26 Stat. 209 (1890), the Clayton Act, 15 U.S.C. § 15(a), and the RICO statute, 18 U.S.C. § 1964(c) (1970), all of which employ identical "by reason of" language.  *See Rothstein*, 708 F.3d at 95.  Because Congress "used the same words," we "assume it intended them to have the same meaning"— namely, that a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Secur. Inv. Protection Corp.*, 503 U.S. 258, 268 (1992).

Elaborating on this requirement, the Second Circuit has rejected any argument that causation can be presumed or diluted in this context.  *Rothstein*, 708 F.3d at 96; *Al Rajhi*, 714 F.3d at 125.  And, of course, "conclusory allegations" of causation are not enough.  *Rothstein*, 708 F.3d at 97; *Al Rajhi*, 714 F.3d at 124 (same).  Instead, the plaintiff must allege facts that plausibly establish that the alleged violation "led directly" to the plaintiff's injuries.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  A causation theory that "stretche[s] the causal chain" linking defendant's alleged conduct to plaintiff's injury "well beyond the first step" cannot satisfy this "direct relationship requirement."  *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 10-11 (2010).[4]

The Complaint falls far short of alleging proximate cause.  Nothing that any Defendant

---

[4] Rather than applying the *Holmes* test, some out-of-circuit courts have read Section 2333 to allow a looser causal connection.  *E.g.*, *Boim v. Holy Land Found. for Relief & Develop.*, 549 F.3d 685, 697 (7th Cir. 2008) (en banc) (applying a more "relaxed" proximate cause standard, at least in cases involving monetary charitable donations made knowingly to a terrorist group (not alleged here)); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 328 (E.D.N.Y. 2015) (requiring plaintiff to plead and prove that defendant's "acts were a substantial factor in causing plaintiffs' injuries" and that "such injuries were a foreseeable result of those acts"), *appeal pending*, 2d Cir. No. 16-2134 (appeal docketed).  These approaches give insufficient effect to the requirement that the injury be "by reason of" the defendant's actions—language that, as shown in the text, had a well understood meaning when Section 2333 was enacted.  *See Holmes*, 503 U.S. at 267.  Both the Supreme Court and the Ninth Circuit have held that, where a statute specifies a "by reason of" requirement, there must be a "direct connection" between the defendant's conduct and the plaintiff's injury; mere "foreseeability" will not suffice.  *See Hemi Grp.*, 559 U.S. at 12; *Couch v. Cate*, 379 F. App'x 560, 565 (9th Cir. 2010); *Mattel v. MGA Entm't*, 782 F. Supp. 2d 911, 1024 (C.D. Cal. 2011).  And as Judge Orrick held in rejecting a similar causation theory in *Fields*, the causal "connection" alleged here is "tenuous at best" and so insufficient "[e]ven under … [a] 'substantial factor' test."  *Fields*, 2016 WL 4205687 at *8.

---

allegedly did can plausibly be said to have "led directly" to the attack that killed Ms. Gonzalez. As in *Rothstein* and *Al Rajhi*, the Complaint's conclusory assertion that Defendants' alleged "provision of material support to ISIS was a proximate cause of the injury inflicted on Plaintiff" (¶¶ 117, 121) is "not entitled to be assumed true," and so cannot establish a plausible claim for relief. *Iqbal*, 556 U.S. at 681. The Second Circuit has squarely rejected any suggestion that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries." *Al Rajhi*, 714 F.3d at 124. The Internet services that Defendants' allegedly provided here are even further removed.[5]

The defects in Plaintiff's causation theory are the same as those identified in *Fields*. Plaintiff "do[es] not allege that ISIS recruited or communicated with [the attackers] over [Defendants' platforms], that ISIS or [the attackers] used [Defendants' platforms] to plan, carry out, or raise funds for the attack, or that [the attackers] ever viewed ISIS-related content on [Defendants' platforms] or even had a[n] … account [on those platforms]." *Fields*, 2016 WL 4205687 at *1. Indeed, the *Fields* plaintiffs at least *tried* to link Twitter to the attacker by alleging that the attacker's "brother told reporters that [the attacker] had been very moved by ISIS's horrific execution of al-Kassasbeh, which ISIS publicized through Twitter." *Id.* at *8. "That connection [was] tenuous at best," *id.*—and Plaintiff here alleges even less.

Instead, the Complaint piles speculation upon speculation: (1) Twitter, Facebook, and/or Google allegedly "knowingly permitted" ISIS to create accounts on their platforms (Compl. ¶ 1),

---

[5] This reasoning applies with even greater force to Plaintiff's cursory allegations regarding Google's sharing of advertising revenue. Compl. ¶¶ 36, 100-105. Although Plaintiff alleges that "Google has placed ads on ISIS postings" (*id.* ¶ 103), the Complaint alleges no facts purporting to link such ads (or revenue associated with them) to any terrorist activity, much less the Paris attacks. The Complaint points to only one YouTube video next to which ads supposedly appeared (*id.*), but provides no information about the amount of revenue connected with that video, or with whom it was shared. Nor does it identify the YouTube user who posted the video, explain what basis exists for linking him or her to ISIS, or offer any explanation for how revenue associated with the video was connected to Ms. Gonzalez's death. In short, Plaintiff does not come close to alleging that the Paris attack was proximately caused by Google's hypothetical sharing of ad revenue from a single video posted by an unidentified user.

and then allegedly failed to take "meaningful action to stop" ISIS by "censor[ing] user content," "shut[ting] down … ISIS-linked account[s]," or blocking ISIS-related accounts from "springing right back up" (*id.* ¶¶ 52, 90, 93); (2) these failures allegedly permitted ISIS to send, via Defendants' platforms, messages designed to recruit new members (*id.* ¶¶ 20-30), raise money (*id.* ¶¶ 31-37), and spread propaganda (*id.* ¶¶ 38-51);  (3) recipients of those messages allegedly responded by joining ISIS and contributing funds (*id.* ¶¶ 26, 27, 28, 33, 35); (4) these recruits, funds, and publicity allegedly helped ISIS grow into a larger terrorist organization (*id.* ¶¶ 1-2); and (5) individuals affiliated with ISIS allegedly carried out the Paris attacks (*id.* ¶ 113). Plaintiff does not even allege these facts as to each Defendant.  *See note 1, supra.*

 This theory of causation is "too speculative [and] attenuated to raise a plausible inference of proximate causation."  *Fields*, 2016 WL 4205687 at *9 n.4.  Courts repeatedly have rejected similar efforts to link businesses to acts of terrorism under Section 2333, including most recently in *Fields*.  *See also Rothstein*, 708 F.3d at 97 (plaintiffs' allegations that UBS provided cash to a state sponsor of terrorism that would be used to cause and facilitate terrorist attacks were not enough to allege proximate causation); *Al Rajhi*, 714 F.3d at 123-125 (same as to allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations").  Plaintiff's chain of inferences here is even less plausible.  Indeed, accepting his causation theory would have staggering consequences, potentially exposing every Internet service provider to liability for terrorist violence anywhere in the world, at any time, simply because the terrorists who carried out the attack may have been loosely affiliated with some among the providers' billions of accountholders.  Such an expansive theory also would have serious First Amendment consequences, potentially imposing liability on Internet providers merely because they provide a neutral forum on which some actors engage in offensive or hateful speech.[6]  A theory that

---

[6] Defendants provide forums through which billions of people can share information and ideas. The Supreme Court and the Ninth Circuit have made clear that, to the extent that liability under 18 U.S.C. § 2339A and § 2339B would implicate protected speech, such an application must survive strict scrutiny under the First Amendment—including a requirement that the speech bear

"stretche[s] the causal chain" this far "beyond the first step" cannot satisfy the statute's "direct relationship requirement." *Hemi Grp.*, 559 U.S. at 10-11.

### B.    The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook Committed An "Act Of International Terrorism"

Even if Plaintiff somehow could satisfy the proximate cause element of Section 2333, dismissal still is required because the Complaint's "factual content" does not "plausibly suggest" that Twitter, Google, or Facebook committed an "act of international terrorism." *Iqbal*, 556 U.S. at 683. Section 2333 does not permit aiding-and-abetting or secondary liability claims. *See Al Rajhi*, 714 F.3d at 123; *accord Rothstein*, 708 F.3d at 97-98; *Boim*, 549 F.3d at 688-690. Accordingly, to state a claim in this case, Plaintiff must plausibly allege that Twitter, Google, and Facebook themselves committed an "act of international terrorism," as defined in Section 2331(1). *Accord Boim*, 549 F.3d at 690. For multiple reasons, Plaintiff cannot do so.

Section 2331(1) establishes three independent elements that each must be present for a defendant's conduct to constitute an act of "international terrorism," which is an express predicate for civil liability under Section 2333: The conduct must (1) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; (2) "appear to be intended" to achieve certain specified terrorist purposes—i.e., "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping"; (3) occur primarily outside the United States or transcend national boundaries. 18 U.S.C. § 2331(1)(A)-(C). Plaintiff's sole effort to satisfy these elements is a citation of two federal criminal statutes that prohibit providing "material support" to terrorists or

---

a direct, non-speculative relationship to terrorist purposes, and that the defendant actually coordinate or act in concert with the terrorist group. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 995-1001 (9th Cir. 2012); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 23-25, 31-32 (2010). The Complaint does not come close to meeting those requirements. Among other things, it does not allege any direct or purposeful support of, or coordination with, ISIS supporters. These First Amendment concerns counsel strongly against any expansive reading of Section 2333.

designated terrorist organizations, 18 U.S.C. § 2339A and § 2339B.  Plaintiff's theory appears to be that offering an online platform that is used by members or supporters of a terrorist organization constitutes "material support" to that organization, and that this should be enough to satisfy Section 2333.  This theory fails for at least two independent reasons.

### 1. The Complaint Fails To Allege Facts Plausibly Establishing That Twitter, Google, or Facebook *Knowingly* Provided Material Support To ISIS

The Complaint does not plausibly allege that Defendants acted with the actual knowledge required for violations of Sections 2339A and 2339B.  *See Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 665-66 (S.D. Tex. 2010) (dismissal of Section 2333 claims warranted due to "[t]he lack of sufficient factual allegations of scienter"); *Stutts v. De Dietrich Grp.*, No. 03-CV-4058, 2006 U.S. Dist. LEXIS 47638, *11-*15 (E.D.N.Y. June 30, 2006) (same).

Count I (which rests on Section 2339A) requires a showing that Defendants provided material support "knowing or intending that [it] be used in preparation for, or in carrying out [an act of terrorism]."  18 U.S.C. § 2339A(a).  The Complaint does not come close to alleging this state of mind.  Even if Paragraph 116 could be read to incant that element of the claim, it is nothing more than a threadbare recital and is not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 678.  And the Complaint contains no factual allegations that would support a plausible conclusion that any Defendant acted with the knowledge or intent required by Section 2339A.  Indeed, Plaintiff's admission that Defendants prohibit terrorist content and remove it when it comes to their attention, *e.g.*, Compl. ¶¶ 24, 64, 97, supports the opposite conclusion.

As for Count II (based on Section 2339B), Defendants "must have knowledge that the organization [to which material support is provided] is a designated terrorist organization …[,] has engaged or engages in terrorist activity, or … has engaged or engages in terrorism."  18 U.S.C. § 2339B(a)(1).  Even if the provision of free online services to the general public could constitute "material support"—which it does not—Plaintiff does not plausibly allege that any Defendant *knowingly* provided such services to ISIS.  "The only relevant allegations are either wholly conclusory or inadequate."  *Abecassis*, 704 F. Supp. 2d at 665.  The Complaint nowhere alleges that any Defendant knew of (and failed to take action against) a specific account used by

ISIS or knowingly allowed the creation of an account for which ISIS was responsible. Instead, the allegations are entirely general: reports that ISIS members or sympathizers used online services, including those provided by Defendants, to recruit and train ISIS operatives, and that Defendants could have done more to stop them. Compl. ¶¶ 52-98. This is not enough.

Section 2339B is a criminal provision with severe penalties, and its mens rea requirement must therefore be strictly construed in favor of the defendant. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010) (noting that "the knowledge requirement of the statute further reduces any potential for vagueness"); *cf. Staples v. United States*, 511 U.S. 600, 616 (1994) (the "penalty imposed under a statute has been a significant consideration in determining" how to apply the *mens rea* requirement of the statute). In particular, the "rule of lenity" requires any ambiguity in the "scope" of the statute to "be resolved in [defendants'] favor." *Crandon v. United States*, 494 U.S. 152, 168 (1990) (applying "rule of lenity" to civil application of a criminal statute); *id.* at 175, 178 (Scalia, J., concurring in the judgment) (same). No case has allowed Section 2339B liability on anything resembling the generalized knowledge allegations here. That is for good reason, given the wide range of conduct that potentially could qualify as "material support" (including the provision of "lodging," "communications equipment," and "transportation"). 18 U.S.C. § 2339A(b)(1). Hotels do not provide material support by offering lodging to the public even if they might know generally that members of a terrorist organization can or do sometimes stay there. Likewise, wireless carriers may know that terrorists groups sometimes communicate over their networks, but that general knowledge is not enough to render the carriers liable as terrorists themselves under the material support statutes.

The same is true here—and even more so, given that what Defendants are providing is a platform for self-expression and sharing of ideas. Defendants offer online services used by billions of people around the world. Plaintiff does not, and could not, allege that Defendants know the identity of each of those users, much less their institutional affiliations. To impose liability under Section 2339B merely because a service provider offers a free and broadly available service to the general public, would stretch the statute beyond reason and precedent. *Accord Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003)

(*Burnett I*) (rejecting claim that bank should be liable "for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service"); *Stutts*, 2006 U.S. Dist. LEXIS 47638, *11-*15 (commercial banking activities such as issuing letters of credit to manufacturers who allegedly sold chemicals and equipment to Iraq does not create liability under Section 2333). The theory would be even more problematic were it extended from financial services to the provision of a neutral forum for the sharing of information, ideas, and other content—a context that implicates important First Amendment concerns. *See* note 6, *supra*. Plaintiff's allegations that Defendants may have been aware, from public reports, that an unidentified handful of their billions of users may have had ties to ISIS, does not establish the requisite knowledge under Section 2339B or constitute an "act of international terrorism" under Section 2333.

Plaintiff's claims regarding Google's alleged sharing of ad revenue with content providers (Compl. ¶¶ 100-105) are equally insufficient. The Complaint identifies one YouTube video that allegedly was linked to advertising, but it does not allege that Google knew of any alleged connection between the video and ISIS. Indeed, there is no indication of who uploaded that video or the name of the YouTube account associated with it. And Plaintiff offers no facts to support their conclusory assertion (*id*. ¶ 104) that the video was posted by ISIS (as opposed to an unaffiliated ISIS sympathizer, or someone with wholly innocent motives), much less that the person who allegedly opted for revenue sharing in connection with the video was part of ISIS. Plaintiff thus does not establish even the first link—that any money went from Google to ISIS.

Plaintiff certainly offers no basis for the further leap that Google *knowingly* shared revenue with ISIS. The Complaint contains not even a token assertion of knowledge, much less the type of specific factual allegations needed to make such a claim plausible. Plaintiff does not allege that YouTube users disclose whether they are part of ISIS in order to register to upload videos or for revenue sharing, or that Google was given information linking ISIS to the person responsible for uploading and monetizing the video, whether before or after related ads began to appear. In short, nothing in the Complaint suggests that Google knew that the referenced video was posted by ISIS or knowingly shared revenue with ISIS. Plaintiff's failure to allege that

1  Google's alleged revenue sharing included the required knowledge precludes any claim against

2  Google on this theory.

3        **2.     The Complaint Fails To Allege Facts Plausibly Establishing That Any
               Defendant's Conduct Involved Violent or Dangerous Acts That
4               "Appear[ed] To Be Intended" To Achieve Specified Terrorist
               Purposes**
5

6        Even if the Complaint could be read to allege material support under Sections 2339A or

7  2339B, dismissal is required because it does not and cannot allege that Defendants' alleged

8  conduct satisfied the other elements of "international terrorism," as required by Section 2333 and

9  defined in Section 2331(1).   In particular, the Complaint fails to allege Defendants' conduct—

10 regardless of what other law it is alleged to have violated—involved "violent" or "dangerous"

11 acts that "appear[ed] to be intended" to achieve certain specifically defined terrorist purposes,

12 namely "to intimidate or coerce a civilian population," "to influence the policy of a government

13 by intimidation or coercion," or "to affect the conduct of a government by mass destruction,

14 assassination, or kidnapping," *id.* § 2331(1)(A), (B).   The latter intent element requires

15 allegations that "would … lead an objective observer" to conclude that the defendant intended to

16 accomplish one of the specified terrorist ends.  *Stansell v. BGP, Inc.*, 2011 WL 1296881, *9

17 (M.D. Fla. Mar., 31, 2011).

18        The objective intent element is not satisfied where, as here, the claimed offending

19 conduct is merely an offering of general services to all comers.[7]  In *Boim*, the Seventh Circuit

20 observed that the Red Cross and Doctors Without Borders "provide [medical] assistance without

21 regard to the circumstances giving rise to the need for it."  549 F.3d at 699.  Although those

22 organizations "might know in advance" that they will "provid[e] … assistance to [individual]

23 terrorists," an objective observer would conclude that providing such aid was intended to achieve

24

25 [7] Even where (unlike here) the "material support" is allegedly targeted to a terrorist organization,
   courts have found the requisite intent lacking when the context "would … lead an objective
26 observer to conclude" that the defendant sought to achieve some other objective.  *Stansell*, 2011
   WL 1296881, *9 (dismissing claim that defendants paid terrorist organization not to promote
27 terrorism, but so that they could conduct their operations "without fear of terrorist acts").

28

a humanitarian, not a terrorist purpose.  *Id.*  Likewise, in *Burnett II*, the court dismissed a complaint that relied on the mistaken "'proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.'"  349 F. Supp. 2d at 832.  An objective observer would conclude that the aim of these defendants was to offer beneficial services to the public at large, not that they intended to promote terrorism.

The same is true here.  Defendants make their services widely available and their neutral tools are part of those services.  *E.g.*, Compl. ¶¶ 3, 21, 38, 47, 63, 102.  The Complaint nowhere asserts that any Defendant provided a specialized product or service specifically designed for ISIS or its members.  No reasonable observer could conclude that Defendants' platforms were meant "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).  Indeed, such a reading could cover not only thousands of other Internet companies, but also scores of other routine service providers, such as wireless carriers and utilities, simply because terrorists or terrorist sympathizers use the services that are made generally available.  Clearly, Congress did not intend such a result.  Plaintiff fails plausibly to allege any "ac[t] of international terrorism" by Defendants.[8]

---

[8] For the same reason, Plaintiff also cannot show Defendants' conduct "involve[d] violent acts or acts dangerous to human life," as required by Section 2331(1)(A).  Offering online services like Twitter, YouTube, and Facebook is not itself violent or dangerous, nor is it made so simply because a terrorist (along with billions of other users) might use those platforms in violation of their terms of service.  Although some courts have suggested that anything qualifying as "material support" under 18 U.S.C. § 2339A might meet the "violent act or acts dangerous to human life" element, *e.g.*, *Linde*, 97 F. Supp. 3d at 328, that suggestion contravenes the language and structure of Section 2331(1), which makes clear that it is the *defendant's* acts—not those of the person who allegedly received "material support"—that must satisfy the statutory elements of "international terrorism."  *E.g.*, *Stutts*, 2006 U.S. Dist. LEXIS 47638, at *2 (under the "plain language" of Section 2333, engaging in commercial banking activity does not constitute "violent acts or acts dangerous to human life").  Automatically equating "material support" with "international terrorism" would read the specific, multi-part definition in Section 2331(1) out of the statute.  Notably, an appeal from the *Linde* case, cited above, is pending before the Second Circuit on this very issue, among others.  *See Linde v. Arab Bank*, No. 16-2134 (appeal docketed); *see also* note 4, *supra*.

---

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  September 2, 2016

Respectfully submitted,

_____/s/ Kristin A. Linsley_____
KRISTIN A. LINSLEY (CA SBN 154148)
kristin.linsley@mto.com
ROSEMARIE T. RING (CA SBN 220769)
rose.ring@mto.com
ANDREW RUBENSTEIN (CA SBN 295116)
andrew.rubenstein@mto.com
MUNGER TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA  94105
Telephone:   (415) 512-4000
Facsimile:      (415) 512-4077

*Attorneys for Defendant*
**FACEBOOK, INC.**

_____/s/ David H. Kramer_____
DAVID H. KRAMER (CA SBN 168452)
dkramer@wsgr.com
LAUREN GALLO WHITE (CA SBN 309075)
lwhite@wsgr.com
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California  94304
Telephone:   (650) 493-9300
Facsimile:      (650) 565-5100

BRIAN M. WILLEN (*pro hac vice*)
bwillen@wsgr.com
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800

*Attorneys for Defendant*
**GOOGLE INC.**

_____/s/ Seth P. Waxman_____
SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6800
Facsimile:  (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 858-6000
Facsimile:  (650) 858-6100

*Attorneys for Defendant*
**TWITTER, INC.**

ATTORNEY ATTESTATION

I, Seth P. Waxman, am the ECF User whose ID and password are being used to file this Notice of Motion, Motion, and Memorandum.  In compliance with N.D. Cal. Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of the document has been obtained from each of the other signatories.

By:   /s/ Seth P. Waxman
        Seth P. Waxman


CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2016, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   /s/ Seth P. Waxman
        Seth P. Waxman