1  DAVID H. KRAMER (CA SBN 168452)
   dkramer@wsgr.com
2  LAUREN GALLO WHITE (CA SBN 309075)
   lwhite@wsgr.com
3  WILSON SONSINI
     GOODRICH & ROSATI, P.C.
4  650 Page Mill Road
   Palo Alto, California  94304
5  Telephone:    (650) 493-9300
   Facsimile:    (650) 565-5100
6

BRIAN M. WILLEN (*pro hac vice*)
bwillen@wsgr.com
WILSON SONSINI
  GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:    (212) 999-5800
Facsimile:    (212) 999-5899

7  *Attorneys for Defendant*
   **GOOGLE INC.**

8

9                    **UNITED STATES DISTRICT COURT**

10        **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

11

12  REYNALDO GONZALEZ, the ESTATE OF
    NOHEMI GONZALEZ, BEATRIZ
13  GONZALEZ, Individually and as the
    Representative of the Estate Of Nohemi
14  Gonzalez, JOSE HERNANDEZ, RAY
    GONZALEZ, and PAUL GONZALEZ
15
16                   Plaintiffs,
17        v.
18  GOOGLE INC.,
19                   Defendant.
20

Case No. 4:16-cv-03282

**REPLY MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF
DEFENDANT GOOGLE INC.'s MOTION
TO DISMISS THE SECOND AMENDED
COMPLAINT PURSUANT TO FED. R.
CIV. P. 12(b)(6)**

Judge: Hon. Donna M. Ryu

[Fed. R. Civ. Proc. 12(b)(6)]

Hearing Date:  July 27, 2017

21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   PLAINTIFFS CANNOT EVADE SECTION 230'S ROBUST IMMUNITY .................1

    A.   JASTA Does Not Impliedly Repeal or Abrogate Section 230 ..........................1

    B.   Section 230 Applies To Litigation Brought In The United States .......................4

    C.   Section 230 Bars Plaintiffs' "Functionality" Theory..............................................4

    D.   Targeting Advertising Does Not Make Google A Content Provider...................6

II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ATA ...................................8

    A.   Plaintiffs Cannot Save Their Secondary Liability Claims....................................8

        1.   Google Is Not Liable For Aiding and Abetting ......................................8

        2.   Google Is Not Liable For Conspiracy....................................................10

    B.   Plaintiffs Cannot Save Their Claims For Direct Liability .................................11

        1.   Plaintiffs Fail to Allege That Google Provided Material Support .........11

        2.   Google Did Not Commit An "Act of International Terrorism".............13

        3.   Plaintiffs Fail to Establish Proximate Cause.........................................14

CONCLUSION..................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Ahmad v. Christian Friends of Israeli Cmtys.*,
 2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. May 5, 2014)............................................11, 15

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) .........................................15

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2008)....................................................4

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)............................................................3, 6

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998).................................................6, 7

*Boim v. Holy Land Found.*, 549 F.3d 685 (7th Cir. 2008) (en banc)................................14

*Boim v. Quranic Literacy Inst.*, 291 F.3d 1000 (7th Cir. 2002).......................................13

*Branch v. Smith*, 538 U.S. 254 (2003) ...........................................................................2

*Brill v. Chevron Corp.*, 2017 U.S. Dist. LEXIS 4132 (N.D. Cal. Jan. 9, 2017)...............13, 14, 15

*Cohen v. Facebook, Inc.*, 2017 U.S. Dist. LEXIS 76701 (E.D.N.Y. May 18, 2017) .............3, 4, 5

*Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016).................................................3

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ......................................................5

*Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ........................6, 7

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016)....................................4, 5, 15

*Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016)..................................4, 5, 15

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009).................................................7

*Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009).........................................9, 12, 13

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...............................................8, 9, 10

*Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163 (2009)............................................3

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...............................................12

*Hui v. Castaneda*, 559 U.S. 799 (2010).........................................................................3

*Hymas v. United States*, 810 F.3d 1312 (Fed. Cir. 2016) ...............................................11

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014)...........................2, 6

*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969 (2016)................................3

*Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015)...................................13

*MCW, Inc. v. Badbusinessbureau.com, LLC*,
    2004 U.S. Dist. LEXIS 6678 (N.D. Tex. Apr. 19, 2004).........................................7

*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010)............................................4

*Morton v. Mancari*, 417 U.S. 535 (1974)..............................................................2

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*,
    1999 U.S. Dist. LEXIS 11599 (S.D.N.Y. July 29, 1999) ...................................9

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ...........................................13

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) .......................................................2

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) .......................................2

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ............................................10, 14

*Ryan v. Hunton & Williams*,
    2000 U.S. Dist. LEXIS 13750 (E.D.N.Y. Sept. 20, 2000).....................................10

*Strauss v. Credit Lyonnais, S.A.*,
    2006 U.S. Dist. LEXIS 72649 (E.D.N.Y. Oct. 5, 2006)..........................................9

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ...............13, 15

*Traynor v. Turnage*, 485 U.S. 535 (1988) ...........................................................1

*United States v. 493,850.00 in U.S. Currency*, 518 F.3d 1159 (9th Cir. 2008) ............1

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007)...................5

*Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202 (2d Cir. 2014)....................11, 12

## STATUTES AND RULES

18 U.S.C. § 2331(1) ...................................................................................13

18 U.S.C. § 2333 .................................................................................. passim

18 U.S.C. § 2339A..................................................................................11, 13

18 U.S.C. § 2339B.............................................................................11, 12, 13

47 U.S.C. § 230(c) ................................................................................ passim

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016)................................................ passim

1   Plaintiffs' Opposition ("Opp.") confirms that Plaintiffs are seeking to hold Google liable

2   for the Paris terrorist attack based on the theory that a handful of third-party users were allegedly

3   able to post objectionable material on YouTube. While Google has profound sympathy for

4   victims of terrorism and unreserved condemnation for terrorist violence, Plaintiffs' legal claims

5   fail: Plaintiffs cannot evade the robust immunity provided by Section 230 of the CDA ("§ 230"),

6   and they have not stated a viable claim under any provision of the Anti-Terrorism Act ("ATA").

7   **I.      PLAINTIFFS CANNOT EVADE SECTION 230'S ROBUST IMMUNITY**

8   As explained in Google's opening brief, § 230 bars claims that seek to hold online

9   services liable for "publisher" activities regarding third-party material. Plaintiffs do not dispute

10  that Google qualifies as an "interactive service provider" or that the allegedly unlawful content at

11  issue was provided by YouTube users. Plaintiffs instead try to evade the immunity on other

12  grounds, but each fails. *First*, an uncodified statement of purpose in the recently enacted Justice

13  Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA")

14  legislation did not impliedly repeal § 230. *Second*, this case involves no "extraterritorial"

15  application of § 230: the immunity applies to legal actions brought in the United States, without

16  regard to whether the claims arise from events that occurred abroad. *Third*, despite Plaintiffs'

17  attempt to characterize Google's conduct as providing communication "functionality" and

18  "account reconstitution," their claims still seek, impermissibly, to impose liability on Google as a

19  publisher. *Fourth*, as a matter of law, Google does not create or provide unlawful content where

20  it targets third-party advertising to user-submitted videos.

21  **A.      <u>JASTA Does Not Impliedly Repeal or Abrogate Section 230</u>**

22  Plaintiffs start by arguing, without citing any authority, that Congress somehow

23  "nullifie[d]" § 230 when it enacted JASTA last year. Opp. 3-5. Congress did no such thing.

24  "It is 'a cardinal principle of statutory construction that repeals by implication are not

25  favored.'" *United States v. 493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008);

26  *accord Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (court will not infer a statutory repeal

27  "unless the later statute 'expressly contradict[s] the original act'"). The Supreme Court thus has

28  made clear that an implied repeal will only be found where two statutes "are in 'irreconcilable

conflict,' or where the latter act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). "[I]n either case, the intention of the legislature to repeal must be clear and manifest." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976).

There is nothing like that here. Plaintiffs can point to nothing in the text or history of JASTA that suggests any intention to repeal § 230. JASTA does not reference § 230, either directly or indirectly, nor does it address in any way the activities of or protections for online service providers. JASTA evinces not the slightest hint that Congress was somehow overriding the established immunity that § 230 has provided for nearly two decades—one that has repeatedly been "understood to merit expansion … into new areas." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014); *e.g.*, 28 U.S.C. § 4102(c) (extending application of § 230 to foreign defamation judgments). Thus, while JASTA created a limited form of secondary liability under the ATA, 18 U.S.C. § 2333(d), it includes no language, such as a "notwithstanding" clause, suggesting any intent to displace the specific immunity afforded to online service providers. *Accord PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011) (discussing longstanding rule that absence of a "*non obstante*" provision indicates that legislature did not intend a repeal by implication). In contrast, JASTA expressly amended the Foreign Sovereign Immunities Act to allow claims against foreign states for certain acts of terrorism occurring in the United States. *See* JASTA § 3(a). This further negates any inference that Congress did something similar for § 230. Where Congress wanted JASTA to displace existing statutory immunities, it made that clear. To read JASTA as surreptitiously repealing other immunities nowhere mentioned in the text or in the extended debates about its passage would override the decisions actually made by Congress.

Rejecting Plaintiffs' approach creates no "irreconcilable conflict" with § 230. *Branch*, 538 U.S. at 273. While JASTA creates a general cause of action for secondary liability arising out of certain acts of international terrorism, § 230 immunity still applies in the specific category

of cases where such claims seek to hold online service providers liable for publishing third-party content. This is the normal interaction of an immunity statute with a liability provision. *Hui v. Castaneda*, 559 U.S. 799 (2010), is instructive. There, the Supreme Court rejected an argument that a later-enacted liability statute impliedly repealed an existing immunity. The Court found no "irreconcilable conflict" merely because the older "more comprehensive immunity" would protect some defendants from liabilities created by the new law. *Id.* at 810-11. This reasoning applies here. Courts have repeatedly invoked § 230 to immunize service providers against claims arising under other federal statutes—including *later* enacted ones. *See Doe v. Backpage.com, LLC*, 817 F.3d 12, 22 (1st Cir. 2016) (§ 230 barred claims under Trafficking Victims Protection Reauthorization Act of 2008), *cert. denied*, 137 S. Ct. 622 (2017). Most directly on point is *Cohen v. Facebook, Inc.*, 2017 U.S. Dist. LEXIS 76701 (E.D.N.Y. May 18, 2017), which applied § 230 to dismiss claims brought under JASTA—in the face of the same implied-repeal argument that Plaintiffs make here. *See* Opp. to Mot. to Dismiss at 27 n.6, *Cohen v. Facebook, Inc.*, No. 16-04453 (E.D.N.Y. Jan. 13, 2017), ECF No. 29. This Court should do likewise.

Plaintiffs' argument is especially weak because it relies not on the substantive provisions of JASTA, but instead on the uncodified findings and statement of purpose that preface the legislation. Opp. 3-5 (citing JASTA §§ 2(a)(6), (b)). It is well settled that such hortatory preambles cannot change the scope of the statute's operative language—and do not effectuate an implied repeal of existing legislation. *See Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009); *accord Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016) ("prefatory clauses or preambles cannot change the scope of the operative clause"). And nothing in JASTA's statement of purpose says anything about online service providers. These statements offer no reason—much less a "clear and manifest" indication (*Hawaii*, 556 U.S. at 175)—to believe that Congress meant to significantly change the law by eliminating § 230's established protections for online intermediaries against claims like these.[1]

---

[1] Plaintiffs are mistaken in asserting that "[n]o part of § 230 relied upon Constitutional principles." Opp. 5. In enacting § 230, "Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet," and the immunity protects important

**B.**     **Section 230 Applies To Litigation Brought In The United States**

Plaintiffs next suggest that § 230 does not apply because "Plaintiffs' claims arose abroad." Opp. 19. This argument is frivolous, and it was correctly rejected the one other time that Plaintiffs' counsel made it. *See Cohen*, 2017 U.S. Dist. LEXIS 76701, at *36-37. In this case, § 230 is asserted as an immunity against claims filed in a U.S. court under U.S. law against a U.S. company by plaintiffs who are U.S. nationals. This application of § 230 is purely domestic; it does not in any way implicate the presumption against giving extraterritorial effect to federal law. To determine whether to invoke that presumption, a court must identify the "objects of the statute's solicitude." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010). Because § 230 is an immunity statute, "the relevant location is that where the grant of immunity is applied, i.e. the situs of the litigation." *Cohen*, 2017 U.S. Dist. LEXIS 76701, at *36-37. In short, where, as here, § 230 is invoked in federal court, the immunity applies without any extraterritorial reach—no matter where the activity that might have given rise to the claim occurred. *Id*. ("Given the statutory focus on limiting liability, … the location of the relevant 'territorial events' or 'relationships' cannot be the place in which the claims arise but instead must be where redress is sought and immunity is needed.").

**C.**     **Section 230 Bars Plaintiffs' "Functionality" Theory**

Nor can Plaintiffs escape § 230 by casting their claims as concerning the provision of "proprietary functions," such as "allow[ing] … accounts to reconstitute" through "incremental naming of accounts which have been taken down" and "bulk friend/following requests." Opp. 20-21. "[W]hat matters" for § 230 immunity is not the "label[]" of the claim but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-03 (9th Cir. 2008). This is far from a new issue, as Plaintiffs suggest (Opp. 17). Applying these principles, every court to confront a theory like Plaintiffs' has concluded that providing accounts is publishing

---

First Amendment principles in ensuring that online platforms are not held liable for providing a conduit for user expression. *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003).

conduct protected by § 230. That is true both in ATA cases—*see Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 970-74 (N.D. Cal. 2016) ("*Fields I*"); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123-27 (N.D. Cal. 2016) ("*Fields II*"); *Cohen*, 2017 U.S. Dist. LEXIS 76701, at \*28-31—and in other contexts, *see Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007); *Doe v. MySpace, Inc.*, 528 F.3d 413, 421 (5th Cir. 2008). As these cases explain, efforts to hold online services liable on this basis impermissibly penalize a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.

Plaintiffs cannot evade this law. They argue that Google could have prevented accounts from reconstituting in a "content-neutral" manner by barring users from selecting usernames "closely related" to those of a blocked account and not "allow[ing] users to connect to other users in a bulk manner." Opp. 21. Even if these strategies truly were content neutral, which they are not, that would make no difference.[2] Because a service provider's "choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform," any "attempt to draw a narrow distinction between policing accounts and policing content must ultimately be rejected." *Cohen*, 2017 U.S. Dist. LEXIS 76701, at \*29. Contrary to Plaintiffs' suggestion (Opp. 17), therefore, § 230 protection does not turn on whether an editorial strategy would require the service provider to make content-based decisions about user material. So long as the objective of a proffered strategy is to control who can publish or under what terms, § 230 bars claims based on a provider's decision not to adopt that strategy. *Lycos* and *MySpace* make that clear, applying the immunity to claims premised on intermediaries' failure to employ supposedly content-neutral strategies, such as barring users from having multiple screen names, *Lycos*, 478 F.3d at 420, and using age-verification tools, *MySpace*, 528 F.3d at 421. So too here; holding Google liable because it supposedly fails to block YouTube users from using certain

---

[2] Beyond the fact that Plaintiffs' policing strategies would require Google to decide what can be posted, including by making assessments about "suspicious conduct" by users (Opp. 21), the very premise of Plaintiffs' claims is an asserted connection between ISIS-related content allegedly posted on YouTube and the Paris attack. Without considering the alleged effect of that third-party content, Plaintiffs have no conceivable basis for trying to hold Google responsible for what happened in Paris. *Accord Fields II*, 217 F. Supp. 3d at 1124-25; *see also infra* n.3.

account names or communicating with other users in certain ways would mean holding Google

liable for protected publisher activities.[3]

Not only is that forbidden by § 230, it would defeat a core objective of the statute: "to

encourage interactive computer services and users of such services to self-police the Internet for

obscenity and other offensive material." *Batzel*, 333 F.3d at 1028. Under Plaintiffs' theory,

immunity evaporated when Google "voluntarily" "chose[] to delete an account," because that

effort supposedly forced Google to "assume[] responsibility" for the content posted on that

account. Opp. 20-21. But this result—whereby a service provider's self-policing efforts become

the basis for holding it liable for user behavior—is exactly what Congress sought to avoid in

enacting § 230. *See Jones*, 755 F.3d at 408 (Section 230 "set out to abrogate" precedent holding

a service provider liable "because it had engaged in voluntary self-policing of … third-party

content"); *Batzel*, 333 F.3d at 1029-30 (same).

### D.   Targeting Advertising Does Not Make Google A Content Provider

Finally, Plaintiffs argue that Google acts as an "information content provider" by

"targeting ads" and creating "composite content." Opp. 22-23. This argument defies established

law. As Google has explained (MTD at 11), a service provider does not "develop" content

merely by "augmenting the content generally," *Fair Hous. Council v. Roommates.com, LLC*, 521

F.3d 1157, 1167-68 (9th Cir. 2008)—even where it "has an active, even aggressive role in

making available content prepared by others," *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52

(D.D.C. 1998). Instead, a provider only loses immunity "if it contributes materially to the alleged

illegality of the conduct." *Roommates*, 521 F.3d at 1168. There is nothing like that here. Not only

are the ads themselves third-party content, Plaintiffs do not suggest that those ads are

objectionable or that they played any role in making the alleged terrorist content at issue

---

[3] Plaintiffs' attempt to focus on the alleged *consequences* of third-party content, such as "new recruits" (Opp. 18-19), similarly fails. A claim premised on the consequences of user material just as much seeks to hold the platform liable as publisher—and is just as much barred—as one premised overtly on the content of that material. That is certainly true here: on Plaintiffs' theory, Google allegedly "provides personnel to ISIS" as a result of allegedly "giving ISIS the means to post, save, and distribute videos and other messages." *Id.* That theory is plainly content-based.

unlawful. Indeed, Plaintiffs' allegations about targeted advertising have nothing to do with their claims under the ATA. Plaintiffs acknowledge that Google's use of targeted advertising applies across YouTube and has no special connection to terrorism. SAC ¶¶ 131-134, 459-462. By using such "neutral tools" to place ads alongside third-party videos, *Roommates*, 521 F.3d at 1171, Google does not lose § 230 protection.[4]

      Plaintiffs separately argue that Google is not immune insofar as it shared advertising revenue with users who posted ISIS-related videos. Opp. 24-25. Here again, however, Plaintiffs cannot explain how a neutral revenue-sharing policy materially contributes to the illegality of terrorist content. Plaintiffs rely on *FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009), but the conduct there—where the service "solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed" (*id*. at 1201)—is worlds' away from what is alleged here. And other cases Plaintiffs cite make clear that simply paying users for content does not fall outside § 230. *Blumenthal*, 992 F. Supp. at 51-52. In any event, Plaintiffs' cursory revenue-sharing allegations fail on their own terms. As discussed in Google's opening brief (at 19-20), Plaintiffs make no plausible allegation that Google actually shared revenue with ISIS—much less that it did so knowingly or that any such hypothetical revenue sharing had any connection with the Paris attack. Plaintiffs offer no response.

---

[4] The cases Plaintiffs cite do not suggest otherwise. *Blumenthal* expressly rejected the argument that § 230 protection is limited to "passive conduit[s]," and the court held AOL immune even though it solicited, paid for, and "affirmatively promoted" the allegedly defamatory third-party content. 992 F. Supp. at 51-52. In *MCW, Inc. v. Badbusinessbureau.com, LLC*, 2004 U.S. Dist. LEXIS 6678, at *32 (N.D. Tex. Apr. 19, 2004), the court held the defendants acted as "information content providers" because they themselves supplied titles and headers that were themselves defamatory. Here, by contrast, Google did not create the ads, and those ads are not alleged to be unlawful. Finally, the aspect of *Roommates* on which Plaintiffs rely involved a service provider that designed its service to require users to submit content in violation of federal law and then made "aggressive use" of such illegal content in conducting its business. 521 F.3d at 1172. Google did nothing like that.

II.     **PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ATA**

A.      <u>**Plaintiffs Cannot Save Their Secondary Liability Claims**</u>

Google's opening brief explained why Plaintiffs fail to establish the key elements of their claims under Section 2333(d) for aiding and abetting and conspiracy. MTD at 15-17. Plaintiffs' response confirms that these claims fail as a matter of law and must be dismissed.

1.      **Google Is Not Liable For Aiding and Abetting**

The text of Section 2333(d) makes clear that only a particular type of assistance can give rise to aiding and abetting liability under the ATA: substantial assistance knowingly provided to "the person who committed" the relevant act of international terrorism. 18 U.S.C. § 2333(d)(2). The statute's narrow focus on the *person* who *committed* the attack sharply contrasts with the formulation that appears earlier in the provision, which more broadly references "an act of international terrorism committed, *planned, or authorized* by an *organization*." *Id.* (emphases added). This textual contrast makes clear that assisting an organization that planned or authorized an attack—but not the person who actually committed it—is not enough for liability. Plaintiffs ignore this limitation. In this case, the persons who committed the attack are the "twelve ISIS terrorists" on the ground in Paris (SAC ¶ 247). Plaintiffs do not even try to show that Google knowingly assisted those individuals. They instead approach aiding and abetting at a far higher level of generality, suggesting that the availability of the YouTube platform provides general assistance to ISIS (Opp. 7-8), such that Google supposedly assisted in "ISIS's ongoing engagement in international terrorism" (Opp. 9). That does not satisfy 2333(d). The absence of any plausible allegation that Google knowingly provided service to the actual persons who committed the Paris attack rules out any aiding and abetting claim in this case.

Even apart from this problem, Plaintiffs fail to establish the requisite knowledge and substantial assistance. First, Plaintiffs must plausibly allege *both* that Google was "generally aware of [its] role as part of an overall illegal … activity at the time [it] provides the assistance" and, separately, that Google knowingly assisted the principal violation. Opp. 6-7 (citing *Halberstam v. Welch*, 705 F.2d 472, 477, 488 (D.C. Cir. 1983)). But they do not make either showing. *Halberstam* illustrates what is missing. In that case, the court found that the defendant

had "general awareness" of her role in the overall illegality based on the fact that she lived with

the principal for five years and witnessed ongoing and direct evidence of his criminal behavior.

705 F.2d at 486-88. Here, in contrast, Plaintiffs have not alleged that Google knew the identity of

any ISIS terrorists using YouTube, much less that it also knew of illegal behavior by those users

"at the time" it was supposedly providing service to them. *Halberstam* separately found that the

defendant had provided "knowing assistance" to the principal violation because, among other

things, she had acted "as banker, bookkeeper, recordkeeper, and secretary … in an unusual way

under unusual circumstances." *Id.* at 486-88 ("Hamilton assisted Welch with knowledge that he

had engaged in illegal acquisition of goods"). Plaintiffs allege nothing like that. They point to no

instance in which Google provided service to particular users whom it knew were actually part of

ISIS. At most, Plaintiffs argue that Google made YouTube widely available to millions of users,

while being generally aware that some people who may have been affiliated with ISIS at times

attempted to use that service. Opp. 8. That is not enough to meet the *mens rea* required for aiding

and abetting liability. *E.g.*, *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, 1999 U.S. Dist.

LEXIS 11599, at *25-26 (S.D.N.Y. July 29, 1999) ("liability for aiding and abetting 'require[s]

actual knowledge of the primary wrong' by the defendant").

Finally, Plaintiffs cannot establish that any assistance Google supposedly provided was

"substantial." "It has long been recognized that substantial assistance means more than just a

little aid, and requires knowledge of the illegal activity that is being aided and abetted, ***a desire

to help that activity succeed***, and some act to further such activity to make it succeed." *Goldberg

v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009) (emphasis added). *Halberstam* assessed

this issue using a six-factor test, which Plaintiffs try to dilute. Opp. 8-9. In so doing, they ignore

that an aider and abettor must act in some deliberate way to help the perpetrator. *Halberstam*,

705 F.3d at 484, 488 (discussing the "state of mind" factor, which involved "a deliberate long-

term intention to participate in an ongoing illicit enterprise"). Plaintiffs do not suggest (nor could

they) that Google had any desire to help ISIS carry out its mission, that it knowingly worked

with ISIS over an extended period of time, or that it did anything to encourage ISIS to engage in

terrorism. In short, Google's alleged assistance is far removed from what happened in

1  *Halberstam*—and from any plausible claim under Section 2333(d). Courts have not hesitated to

2  reject similarly inadequate allegations of aiding and abetting. *See Goldberg*, 660 F. Supp. 2d at

3  425 ("[D]efendant's alleged actions in performing three wire transfers for [a primary Hamas

4  fundraiser] fail to establish 'substantial assistance' of the sort required to support an aiding and

5  abetting claim."); *Strauss v. Credit Lyonnais, S.A.*, 2006 U.S. Dist. LEXIS 72649, at *32-33

6  (E.D.N.Y. Oct. 5, 2006) (holding that "allegations that defendant knowingly maintained accounts

7  for CBSP and knowingly transferred money to HAMAS-controlled entities" did not allege

8  "sufficient facts to sustain an aiding and abetting claim"), *overruled on other grounds by

9  Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *Ryan v. Hunton & Williams*, 2000 U.S.

10  Dist. LEXIS 13750, at *29 (E.D.N.Y. Sept. 20, 2000) (allegations of a bank's "failing to shut

11  down the accounts sooner" does "not rise to the level of substantial assistance").

12  ## 2.    Google Is Not Liable For Conspiracy

13  For similar reasons, Plaintiffs cannot proceed with a conspiracy claim. As with aiding

14  and abetting, the "agreement" required for conspiracy under the ATA must be with the "person

15  who committed [the] act of international terrorism" (18 U.S.C. § 2333(d)(2)). Plaintiffs ignore

16  this requirement. They do not suggest that Google entered into any agreement with any of the 12

17  terrorists who actually committed the Paris attack. Indeed, Plaintiffs do not even mention those

18  individuals in trying to defend their claim. Opp. 9-10. Plaintiffs instead argue that the Court

19  could infer that Google had an agreement with ISIS more generally. As a matter of law, that is

20  not enough to satisfy Section 2333(d). But this conspiracy story also fails on its own terms.

21  Allegations that Google made YouTube widely available for use by the public, that Google knew

22  generally that some people affiliated with ISIS might attempt to use YouTube, and that Google

23  could have done more to prevent ISIS-affiliated users from being able to post content, simply do

24  not amount to "indirect evidence" of a conspiracy between YouTube and ISIS. What is required

25  is an agreement "to participate in an unlawful act." *Halberstam*, 705 F.2d at 477. That does not

26  exist here. As such, whether conspiracy liability can ultimately be established with proof of a

27  "tacit" agreement is beside the point. Nothing that Plaintiffs allege or argue plausibly suggests

28

that Google was a "willing partner" of ISIS (*id*. at 486)—that it knowingly entered into an

agreement with ISIS with the aim of helping it carry out its unlawful terroristic objectives.

### B.   Plaintiffs Cannot Save Their Claims For Direct Liability

Plaintiffs fare no better in trying to save their direct liability claims. Google did not itself

commit an "act of international terrorism" that proximately caused Plaintiffs' injuries.

#### 1.   Plaintiffs Fail to Allege That Google Provided Material Support

Plaintiffs' Opposition makes clear that their direct liability claim is based solely on the

theory that Google provided "material support" and that this supposed violation amounts to an

"act of international terrorism" under the ATA. This theory fails at both steps.

First, as Google explained in its opening brief (at 18-19), the SAC fails to allege the

knowledge necessary for a violation of the material support statutes. Plaintiffs invoke 2339A and

2339B, each of which has its own *mens rea* requirement.[5] As to the former, Plaintiffs rely (Opp.

12) on *Ahmad v. Christian Friends of Israeli Communities*, 2014 U.S. Dist. LEXIS 62053

(S.D.N.Y. May 5, 2014), *aff'd*, 600 F. App'x 800 (2d Cir. 2015), but that case does not help

them. *Ahmad* dismissed an ATA claim where the plaintiffs failed to plausibly allege that the

defendant "kn[ew] or intended that the support would be used in preparation for, or in carrying

out, violations of certain federal criminal statutes." *Id.* at *7-12 ("[T]he Amended Complaint

alleges no facts suggesting that Defendants were aware—or even deliberately indifferent to the

possibility—that the financial support they provided to 'the Settlers' would be used to support

any violent activity."). As in *Ahmad*, Plaintiffs fail to offer any concrete factual allegations

establishing that Google had such knowledge, and their conclusory assertions are insufficient.

---

[5] Plaintiffs' discussion of the evidentiary standard of proving scienter (Opp. 13 n.6) has no
bearing on whether their factual allegations satisfy the statute's requirements. Plaintiffs also
suggest that JASTA's uncodified "findings" somehow changed the express scienter standard for
claims based on the material support laws. Opp. 4. But, as explained above (*supra* § I.A), this
prefatory language cannot expand JASTA's own terms, much less that of other statutes that
JASTA did not purport to amend. *See also Hymas v. United States*, 810 F.3d 1312, 1323 (Fed.
Cir. 2016) ("[A] preamble cannot overcome the statute's plain language."). In any event,
Plaintiffs have not plausibly alleged that Google *recklessly* provided material support to ISIS.

1        As for 2339B, Plaintiffs focus on their allegations that Google knew that ISIS is a

2   designated foreign terrorist organization. Opp. 10, 12-13. That is not enough. The statute also

3   requires a showing that the defendant knowingly provided material support to the terrorist

4   organization in the first place. *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d

5   Cir. 2014) ("[T]o fulfill § 2339B(a)(1)'s scienter requirement, … Plaintiffs must show that

6   NatWest both knew that it was providing material support to Interpal *and* knew that Interpal

7   engaged in terrorist activity." (emphasis added)). To satisfy this element, the defendant must

8   have known that it was providing support directly to the organization itself—that is, that the

9   support was "coordinated with or under the direction of a designated foreign terrorist

10  organization." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-32 (2010). Plaintiffs fail to

11  make this showing: nothing in the SAC or the opposition brief allows the conclusion that Google

12  deliberately provided support to particular YouTube users that it knew were part of ISIS.

13       The cases that Plaintiffs cite do not help them. Opp. 12-13. It was undisputed in those

14  cases that the defendants had knowingly provided financial services to specific customers who

15  were involved in terrorism; the only question was whether the defendants also knew of that

16  involvement. *See Weiss*, 768 F.3d at 208; *Goldberg*, 660 F. Supp. 2d at 428. This case is

17  different. YouTube is a free and widely available online platform used by hundreds of millions

18  of people. Plaintiffs cannot seriously claim that Google knows the identity and affiliation of

19  everyone who uses its service, or that it "knowingly" provides support to each of those users.

20  Given that, generalized awareness that unspecified users linked to ISIS may be on YouTube

21  cannot be enough to establish the *mens rea* required by 2339B. But such broad-based allegations

22  are all that Plaintiffs offer. They say that unidentified YouTube accounts displayed "the emblems

23  and symbols of ISIS," without suggesting that Google was ever aware of those accounts. Opp.

24  13. And while Plaintiffs acknowledge that Google removed ISIS accounts when it did learn

25  about them, they claim that Google failed to make "sustained efforts to ensure that ISIS would

26  not re-establish the accounts." *Id*. A supposed lack of "sustained effort" is not knowingly

27  providing material support. Plaintiffs do not allege that Google knew (or consciously

28  disregarded) that any specific YouTube accounts belonged to ISIS, yet continued to provide

1    service to those users. In nevertheless seeking to hold Google liable under 2339B, Plaintiffs

2    would dilute this criminal statute's knowledge requirements beyond what the law allows.[6]

3              **2.       Google Did Not Commit An "Act of International Terrorism"**

4              Even if Plaintiffs could assert a violation of the material support laws, that would not

5    state a claim under the ATA. As Google explained in its opening brief (at 20-22), the ATA's

6    plain language, including its multi-part definition of "international terrorism" (§ 2331(1)), makes

7    clear that "a violation of the criminal laws of the United States" alone is not enough. Plaintiffs

8    offer no good response. Opp. 14. They cite *Boim v. Quranic Literacy Institute*, 291 F.3d 1000

9    (7th Cir. 2002), but that case says only that providing material support by donating large

10   amounts of money to Hamas, knowing of the group's terrorist aims, met the definition of

11   "international terrorism." *Id*. at 1014-15. The Seventh Circuit did not hold that every violation of

12   the material support laws would similarly amount to an act of international terrorism under the

13   ATA. Indeed, Plaintiffs' argument was expressly rejected in a recent decision of this Court.

14   Judge Donato dismissed an ATA claim where, as here, the plaintiff failed to allege that the

15   defendant's acts were intended for one of the terrorist purposes set out in Section 2331(1)(B).

16   *Brill v. Chevron Corp.*, 2017 U.S. Dist. LEXIS 4132, at *17-18 (N.D. Cal. Jan. 9, 2017)

17   ("Contrary to plaintiffs' suggestion, *Boim* indicates that § 2331(1)(B) needs to be met in its own

18   right as a required element of 'international terrorism.' And unlike *Boim*, the factual allegations

19   here do not establish that terrorism was a 'foreseeable consequence' of Chevron's actions such

20   that the outward appearance requirement of § 2331(1)(B) has already been satisfied.").

21             The out-of-district cases Plaintiffs cite as holding otherwise misconstrued *Boim* and

22   improperly disregard key provisions of Section 2331(1). Opp. 14 (citing *Strauss v. Credit*

23   ────────────────

24   [6] Plaintiffs' inability to establish the required knowledge defeats any material support claim
     in this case, but the Court should be equally wary of Plaintiffs' assertion (Opp. 11), that failing to
25   stop someone's use of an open Internet platform like YouTube constitutes "material support" for
     terrorism. Plaintiffs' expansive reading has no support in precedent, and the suggestion that
     Google could be held criminally liable under 2339A and 2339B simply because certain users
26   may have posted content on YouTube (despite Google's efforts and in violation of its rules)
     would raise serious First Amendment concerns. *Cf. Packingham v. North Carolina*, 137 S. Ct.
27   1730 (2017) (First Amendment protects use of social media services).

28

1   *Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013); *Goldberg*, 660 F. Supp. 2d at 427;

2   *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 322 (E.D.N.Y. 2015)). Those cases are also

3   distinguishable. Knowingly giving large sums of money to known terrorist groups may be "like

4   giving a loaded gun to a child." *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008)

5   (en banc). But, as *Boim* itself recognized, offering a general service to millions of people

6   worldwide would not constitute an act of international terrorism just because terrorists may be

7   among those who might receive it. *Id.* at 699 (discussing Doctors Without Borders); *see also*

8   MTD at 21-22. Plaintiffs do not even try to explain how Google engaged in conduct that is not

9   only "dangerous to human life," but also appears "intended … to intimidate or coerce a civilian

10  population," simply by offering the YouTube service to the public. As in *Brill*, the allegations

11  that Plaintiffs make are far removed from the donations in *Boim* and from the kind of substantial

12  and direct assistance to terrorist entities that have led courts to allow ATA claims premised on

13  material support to proceed.[7]

### 3.   Plaintiffs Fail to Establish Proximate Cause

15          Finally, Plaintiffs make no effort to establish proximate cause. Instead, they ask the Court

16  to embrace a looser causation standard used by some out-of-circuit courts. Opp. 15-16. But, as

17  Google has explained (MTD at 23 & n.3), this approach ignores established precedent, which

18  makes clear that the statutory term "by reason of" in the ATA requires proximate cause—that is,

19  a sufficiently "direct relation" between Google's alleged "material support" and the Paris attack.

20  *See also Brill*, 2017 U.S. Dist. LEXIS 4132, at *20 ("[T]he proximate causation standard

21  articulated by the Second Circuit in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) … is well-

---

[7] As Judge Donato explained: "The non-conclusory allegations state that Chevron 'turned a blind eye' when records showed that the premiums it was paying to third parties 'increased noticeably when Saddam Hussein began demanding kickbacks in August 2000,' and that Chevron 'routinely purchased oil from unknown entities without conducting any background checks or investigation into potential ties with Saddam Hussein.' But these are a far cry from an allegation that Chevron was a knowing and direct donor to Hussein akin to the allegations in *Boim*. **The allegation here is more that Chevron should have, but didn't, take a harder look at the consequences of its payments. That is not enough.**" *Brill*, 2017 U.S. Dist. LEXIS 4132, at *18-20 (emphasis added).

1  reasoned and compelling, and the Court applies it here."). Likewise, Plaintiffs' focus on

2  "foreseeability" (Opp. 15) flies in the face of recent Supreme Court authority confirming that

3  "foreseeability alone does not ensure the close connection that proximate cause requires." *Bank*

4  *of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017). There is no justification for

5  breaking with this settled understanding of causation.[8]

6         But even if Plaintiffs' misguided formulation were accepted, their claims still would fail.

7  Plaintiffs have not plausibly alleged with supporting factual allegations that Google's "actions

8  were 'a substantial factor in the sequence of responsible causation.'" Opp. 15 (quoting *Strauss*,

9  925 F. Supp. 2d at 432). Nothing in the SAC credibly suggests that Google's allegedly imperfect

10 efforts to police YouTube against use by terrorists were a substantial factor leading to the Paris

11 attack. *See, e.g.*, *Ahmad*, 2014 U.S. Dist. LEXIS 62053, at *13-14 (finding no proximate cause

12 based on alleged transfer of funds to a large group some of whom eventually committed terrorist

13 attacks); *Brill*, 2017 U.S. Dist. LEXIS 4132, at *20 ("Plaintiffs fall short under that [causation]

14 test because they do not allege that Chevron 'participated in' the twenty-one terrorist attacks that

15 injured plaintiffs or that they 'provided money directly to' Hussein; nor are there factual

16 allegations that the premiums paid by Chevron 'actually [were] transferred to [Hussein] and

17 aided in' the twenty-one attacks."). In short, Plaintiffs' alleged chain of causation is "too

18 speculative [and] attenuated to raise a plausible inference of proximate causation." *Fields I*, 200

19 F. Supp. 3d at 974 n.4; *Fields II*, 217 F. Supp. 3d at 1127 n.3.

20                                          **CONCLUSION**

21         Plaintiffs' claims are barred by § 230 and fail to state a viable cause of action under the

22 ATA. Especially in light of the robust immunity that protects Google in this case, any further

23 attempt to amend the complaint would be futile. The SAC should be dismissed with prejudice.

---

24  [8] Plaintiffs argue that JASTA's "findings" somehow impliedly narrow the ATA's causation

25 requirement. Opp. 4. They do no such thing. JASTA did not amend the "by reason of" language
    in Section 2333(a) and did not purport to alter the causation analysis that this phrase has long

26 been understood to require. As discussed above, moreover, the preamble cannot expand

27 JASTA's operative terms (*supra* § I.A & n.5)—especially given that the findings are totally
    silent about causation. *See* JASTA § (2)(a).

28

Dated:  July 7, 2017

Respectfully submitted,

/s/ *Brian M. Willen*
BRIAN M. WILLEN (*pro hac vice*)
bwillen@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 999-5800


DAVID H. KRAMER (CA SBN 168452)
dkramer@wsgr.com
LAUREN GALLO WHITE (CA SBN 309075)
lwhite@wsgr.com
WILSON SONSINI
   GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California  94304
Telephone:     (650) 493-9300
Facsimile:     (650) 565-5100

*Attorneys for Defendant*
**GOOGLE INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:   /s/ Brian M. Willen
Brian M. Willen