UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REYNALDO GONZALEZ, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>GOOGLE, INC., et al.,<br><br>          Defendants. | Case No.  16-cv-03282-DMR<br><br>**ORDER ON DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 100 |

This case arises from the tragic death of Nohemi Gonzalez, who was murdered during the November 2015 attacks in Paris committed by terrorists associated with the Islamic State of Iraq and Syria ("ISIS").  Plaintiffs are Gonzalez's surviving family members, including her mother, father, stepfather, and brothers.  They seek to hold Defendant Google, Inc. ("Google") liable for her death under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, based on Google's ownership and operation of YouTube.  Plaintiffs contend that Google has knowingly provided material support to ISIS in the form of its YouTube platform, and that ISIS has used YouTube as a tool to commit terrorism.  According to Plaintiffs, Google's material support was a proximate cause of Gonzalez's death.

Google moves to dismiss the second amended complaint ("SAC"), primarily arguing that all of Plaintiffs' claims are barred by the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1), which protects online service providers from liability for material posted on a provider's website by others.  The court held a hearing on July 27, 2017.  For the following reasons, Google's motion is granted.  The SAC is dismissed with leave to amend.

**I.      BACKGROUND**

Plaintiffs make the following allegations in the SAC, all of which are taken as true for

United States District Court
Northern District of California

purposes of this motion.[1]  In the fall of 2015, Nohemi Gonzalez was a 26-year old California State University student studying abroad in Paris, France.  [Docket No. 95 (SAC) ¶ 408.]  On November 13, 2015, Gonzalez was dining with a group of friends at La Belle Équipe, a Paris bistro.  A few minutes into their meal, three ISIS terrorists, Abdelhamid Abaaoud, Brahim Abdeslam, and Chakib Akrouh, approached the restaurant and began spraying the patrons with bullets, killing Gonzalez and 18 others.  *Id.* at ¶¶ 412-414.  Two other groups of ISIS terrorists mounted coordinated attacks that night at other locations in Paris, including the Stade de France and the Bataclan Theatre concert hall.  They eventually killed 130 individuals and wounded nearly 400.  *Id.* at ¶¶ 342-370.  ISIS issued statements claiming responsibility for the attacks, including audio and video messages posted on YouTube, a free online video platform owned and operated by Google.  *Id.* at ¶¶ 131, 138, 373-378, 382-390.  Plaintiffs allege that twelve individual ISIS terrorists were directly involved in the Paris attacks, including the three La Belle Équipe shooters.  *Id.* at ¶ 247.

The SAC describes in detail the origins of ISIS, which is a designated foreign terrorist organization ("FTO") under the Immigration and Nationality Act, 8 U.S.C. § 1189.  *Id.* at ¶¶ 60-127.  Plaintiffs allege that YouTube "has played an essential role in the rise of ISIS to become the most feared terrorist organization in the world."  *Id.* at ¶ 139.  YouTube provides ISIS with a "unique and powerful tool of communication" that enables it to achieve its program of terrorism and motivate others to carry out more terrorist attacks.  *Id.* at ¶¶ 140-146.  Plaintiffs contend that ISIS uses YouTube as a means to accomplish many of its goals:

> ISIS not only uses YouTube for recruiting, planning, inciting, and giving instructions for terror attacks, ISIS also uses YouTube to issue terroristic threats, attract attention to its terror attacks and atrocities, instill and intensify fear from terror attacks, intimidate and coerce civilian populations, take credit for terror attacks, communicate its desired messages about the terror attacks, reach its desired audiences, demand and attempt to obtain results from the terror attacks, and influence and affect government policies and conduct.

---

[1] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

1    *Id.* at ¶ 148.  Plaintiffs describe a number of videos that allegedly were posted on YouTube at the

2    direction of individuals affiliated with ISIS, including gruesome depictions of executions of ISIS

3    prisoners.  *See id.* at ¶¶ 104-105, 120, 172, 175, 188, 190-92, 205-226, 274-279, 296-298, 306-

4    309.  According to Plaintiffs, ISIS has recruited more than 30,000 foreign volunteers since 2014

5    through its use of YouTube and other social media platforms.  *Id.* at ¶ 193.

6            The SAC details the planning and execution of the Paris attacks.  *Id.* at ¶¶ 240-372.

7    Plaintiffs allege that "a major component of the Paris Attack was the messaging disseminated by

8    ISIS prior to, during, and after the events," and that the planning for the attacks "involved the use

9    of YouTube, before and after the attack, to intensify the fear and intimidation that ISIS intended to

10   inflict by this mass casualty attack."  *Id.* at ¶¶ 242-244.  According to Plaintiffs, ISIS used

11   YouTube's platform and services to "facilitate and accomplish" the goals of the attacks—

12   intimidation, coercion, and influence.  *Id.* at ¶¶ 241, 244.  Of the twelve ISIS terrorists who carried

13   out the attacks, Plaintiffs allege that two, Abaaoud and Najim Laachraoui, used online social

14   media platforms to post alleged terrorist recruiting videos.  *Id.* at ¶¶ 247, 296, 302.  Specifically,

15   Plaintiffs allege that in March 2014, Abaaoud "posted a link on his Facebook account to an ISIS

16   recruiting video on YouTube," and that Laachraoui "actively followed ISIS social media accounts

17   and posted links to *jihadi* YouTube videos on his own accounts as well."  *Id.* at ¶¶ 296-298, 302.

18           The SAC also contains allegations about the operation of the YouTube platform.

19   Registered users may establish a YouTube "channel," post videos on the platform, and post

20   comments on the pages of YouTube channels and videos.  *Id.* at ¶ 134.  When a YouTube user

21   posts a video, "Google's computer servers receive the information and distribute it to the YouTube

22   user's network of YouTube channel 'subscribers.'"  *Id.* at ¶ 464.  Google employs algorithms to

23   help users locate other videos and accounts with similarities, "introducing users to other users and

24   videos that they will be interested in based on the video and account information and

25   characteristics."  *Id.* at ¶¶ 470-471.  "[I]n this way, users are able to locate other videos and

26   accounts related to ISIS even if they do not know the correct identifier or if the original YouTube

27   account has been replaced by a new identifier."  *Id.* at ¶ 470.

28           Plaintiffs further allege that Google derives revenue from ads on YouTube.  According to

United States District Court
Northern District of California

3

Plaintiffs, Google targets ads to the viewer "based upon algorithms that analyze and use data about the ads, the user, and the video posted. *Id*. at ¶¶ 448-449. Google "agrees to share[] a percentage of the revenue it generates from ads placed before YouTube videos with the user who posts the video." *Id*. at ¶ 452. Plaintiffs allege upon information and belief that "Google has reviewed and approved ISIS videos, including videos posted by ISIS-affiliated users, for 'monetization' through" its placement of ads with these videos. By approving such videos, "Google has agreed to share with ISIS and ISIS-affiliated users a percentage of revenues generated by these ads." *Id*. at ¶¶ 456-457. The SAC includes a screen shot of an example of Google-placed targeted ads alongside what Plaintiffs describe as "an ISIS video" on YouTube. *Id*. at ¶ 458.

Plaintiffs allege that Google is a "content creator." While admitting that Google does not make the videos that are posted on YouTube, Plaintiffs allege that Google creates "new unique content" for viewers "by choosing which advertisement to combine with the posted video with knowledge about the viewer." *Id*. at ¶ 461. In that way, "Google is not simply passing along content created by third parties"; instead, "Google incorporates ISIS posted videos along with advertisements matched to the viewer to create new content for which Google earns revenue." *Id*. at ¶ 462.

Plaintiffs allege that Google has the ability to deny its YouTube-related services to ISIS, but refuses to do so. Although Google has suspended or blocked certain ISIS-related accounts at various times, prior to the Paris attacks, Google did not make "substantial or sustained efforts to ensure that ISIS would not re-establish the accounts using new identifiers." *Id*. at ¶ 429. Even though Google has tools to identify, flag, review, and remove ISIS YouTube accounts, it allows the accounts of "those who run afoul of its policies . . . to be quickly regenerated." *Id*. at ¶ 475.

Based on these allegations, Plaintiffs contend that Google violated federal prohibitions by providing material support or resources for acts of international terrorism. They bring four claims for relief under the ATA's civil remedy provisions, 18 U.S.C. § 2333(a) and (d). Section 2333(a) provides for a private right of action for damages sustained in an act of international terrorism:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any

United States District Court
Northern District of California

1

> appropriate district court of the United States and shall recover
> threefold the damages he or she sustains and the cost of the suit,
> including attorney's fees.

2

3    18 U.S.C. § 2333(a).  Section 2333(d) provides that liability attaches to those who aid or abet an

4    act of international terrorism by knowingly providing substantial assistance:

5

> In an action under subsection (a) for an injury arising from an act of
> international terrorism committed, planned, or authorized by an
> organization that had been designated as a foreign terrorist
> organization . . . liability may be asserted as to any person who aids
> and abets, by knowingly providing substantial assistance, or who
> conspires with the person who committed such an act of
> international terrorism.

6

7

8

9

10    18 U.S.C. § 2333(d).

11        Plaintiffs' first and second claims for relief assert that Google is liable for aiding and

12    abetting acts of international terrorism under section 2333(d) because it is "knowingly provid[ing]

13    substantial assistance and encouragement to ISIS" and "conspiring with ISIS."  FAC ¶¶ 485, 490-

14    491.  The third claim for relief asserts that Google is liable under section 2333(a) for providing

15    ISIS with "material support and resources" in violation of 18 U.S.C. § 2339A, a federal criminal

16    statute which prohibits the provision of "material support or resources" to terrorists in the form of

17    services, equipment, and personnel.  *Id.* at ¶¶ 493-497.  The fourth claim asserts that Google is

18    liable under section 2333(a) based on its violation of 18 U.S.C. § 2339B(a)(1), which criminalizes

19    the knowing provision of "material support or resources to a foreign terrorist organization."

20    Plaintiffs contend that Google violates section 2339B(a)(1) by "providing the YouTube platform

21    and other services for ISIS's benefit.  *Id.* at ¶¶ 500-504.

22        Google moves to dismiss all of Plaintiff's claims on the ground that Section 230 of the

23    Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230(c)(1), bars any claim that seeks

24    to hold an online service provider liable for injuries allegedly resulting from its hosting of third-

25    party material.  It also argues that Plaintiffs' claims are insufficiently pleaded.

26    **II.    LEGAL STANDARD**

27        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

28    the complaint.  *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

*United States District Court*
*Northern District of California*

5

United States District Court
Northern District of California

1    When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all

2    of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

3    (per curiam) (citation omitted), and may dismiss a claim "only where there is no cognizable legal

4    theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to

5    relief." *Shroyer v. New Cingular Wireless Servs., Inc*., 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

6    *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

7    2001). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court

8    to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*,

9    556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than

10   labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

11   *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286

12   (1986)); *see Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001), *overruled on other grounds by*

13   *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

14   **III.    DISCUSSION**

15       Google argues that section 230(c)(1) of the CDA "immunizes providers of interactive

16   computer services against liability arising from content created by third parties," and thereby bars

17   all of Plaintiffs' claims. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com,*

18   *LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). In response, Plaintiffs argue that section

19   230(c)(1) does not apply in this case because it was abrogated by the recently enacted Justice

20   Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016).

21   Plaintiffs also contend that section 230(c)(1) immunity does not attach here, because the statute

22   cannot apply outside the territorial jurisdiction of the United States. Finally, Plaintiffs assert that

23   even if section 230(c)(1) applies, it does not provide Google with immunity on these facts. The

24   court will begin with an overview of section 230(c)(1) before turning to the parties' arguments.

25       **A.    Background of Section 230(c)(1)**

26       Section 230(c), titled "Protection for 'Good Samaritan' blocking and screening of

27   offensive material," provides two types of protection from civil liability. Only the first is relevant

28   here. Section 230(c)(1) mandates that "[n]o provider or user of an interactive computer service

6

shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).[2]   Accordingly, section 230(c)(1) "precludes liability that treats a website as the publisher or speaker of information users provide on the website." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016).   "In general, this section protects websites from liability for material posted on the website by someone else." *Id.*   Section 230(c)(1) "overrides the traditional treatment of publishers, distributors, and speakers under statutory and common law." *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003).   "As a matter of policy, 'Congress decided not to treat providers of interactive computer services like other information providers such as newspapers, magazines or television and radio stations, all of which may be held liable for publishing or distributing obscene or defamatory material written or prepared by others.'" *Id.* at 1026 (quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998)).   In the absence of the protection afforded by section 230(c)(1), one who published or distributed speech online "could be held liable for defamation even if he or she was not the author of the defamatory text, and . . . at least with regard to publishers, even if unaware of the statement." *Id.* at 1026-27.

The Ninth Circuit has held that the CDA "does not declare 'a general immunity from liability deriving from third-party content.'" *Internet Brands*, 824 F.3d at 852 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)).   Nor was it "meant to create a lawless no-man's land on the Internet." *Roommates*, 521 F.3d at 1164.   Rather, "section 230(c)(1) protects

---

[2] The second immunity provision, section 230(c)(2), states:

> No provider or user of an interactive computer service shall be held liable on account of—
>
> > **(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> >
> > **(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1). . . .

47 U.S.C. § 230(c)(2).

United States District Court
Northern District of California

1    from liability only (a) a provider or user of an interactive computer service (b) that the plaintiff

2    seeks to treat as a publisher or speaker (c) of information provided by another information content

3    provider." *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 969 (N.D. Cal. 2016) (citing *Barnes*, 570

4    F.3d at 1100-01).

5        **B.    JASTA**

6        Plaintiffs argue that JASTA repealed the immunity provisions of the CDA, rendering

7    section 230(c)(1) inapplicable in this case.  Congress enacted JASTA in September 2016.  JASTA

8    expanded the ATA by adding 18 U.S.C. § 2333(d), which provides that US nationals may assert

9    liability against a person who aids and abets or conspires with a person who commits an act of

10   international terrorism.  JASTA also amended the Foreign Sovereign Immunities Act ("FSIA"), 28

11   U.S.C. §§ 1602-1611, to add a terrorism-related exception to the FSIA's grant of immunity to

12   foreign states.

13       JASTA includes the following statement of purpose:

14           The purpose of this Act is to provide civil litigants with the broadest
             possible basis, consistent with the Constitution of the United States,
15           to seek relief against persons, entities, and foreign countries,
             wherever acting and wherever they may be found, that have
16           provided material support, directly or indirectly, to foreign
             organizations or persons that engage in terrorist activities against the
17           United States.

18   JASTA § 2(b).  According to Plaintiffs, JASTA is "a game-changer" that "nullifies" Google's

19   motion, as it is a "much more recent expression of Congressional intent" than section 230(c)(1),

20   which was enacted in 1996 and last amended in 1998.  Opp'n 3-4.  Plaintiffs argue that in light of

21   Congress's expressed intent to provide justice to victims of international terrorism, JASTA

22   repealed the protections provided by section 230(c)(1).  *Id*. at 5.

23       Plaintiffs do not clearly state their theory of repeal.  There are two kinds of statutory

24   repeal, express and implied.  "[A]n express repeal requires that Congress overtly state with

25   specificity that the subsequent statute repeals a portion of the earlier statute." *Patten v. United*

26   *States*, 116 F.3d 1029, 1033 (4th Cir. 1997) (quoting *Gallenstein v. United States*, 975 F.2d 286,

27   290 (6th Cir. 1992)).  Here, since JASTA does not specifically refer to section 230, it did not

28   expressly repeal the protections set forth in the relevant portions of the CDA.  *See Moyle v. Dir.,*

United States District Court
Northern District of California

8

*Office of Workers' Comp. Programs*, 147 F.3d 1116, 1119 n.4 (9th Cir. 1998) (express repeal requires "reasonably certain identification of [the] affected act" (citation omitted)).

Although not clearly articulated by Plaintiffs, the court assumes that Plaintiffs' theory is that JASTA impliedly repealed section 230(c)(1). "It is a cardinal principle of statutory construction that repeals by implication are not favored." *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008) (quoting *City & Cty. of S.F. v. Assessment Appeals Bd.*, 122 F.3d 1274, 1276 (9th Cir. 1997)). "An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (statutes are in "irreconcilable conflict" when there is a "positive repugnancy between them or . . . they cannot mutually coexist."). "[I]n either case, the intention of the legislature to repeal must be clear and manifest." *Radzanower*, 426 U.S. at 154 (quoting *Posadas*, 296 U.S. at 503).

The second type of implied repeal is not at issue here, as JASTA did not cover the entire subject of the relevant portion of the CDA, which provides "[p]rotection for private blocking and screening of offensive material" that exists online. *See* 47 U.S.C. § 230. Accordingly, the court assumes that Plaintiffs' argument rests on a purported "irreconcilable conflict" between JASTA and the CDA. Courts analyzing whether an irreconcilable conflict exists between two statutes examine the language of the statutes as well as relevant legislative history. For example, in *Moyle*, the Ninth Circuit considered whether a Social Security Act ("SSA") garnishment provision impliedly repealed an anti-alienation provision of the Longshore and Harbor Workers' Compensation Act ("LHWCA") that Congress had enacted 48 years earlier. 147 F.3d at 1118-19. The court found that the two provisions were in irreconcilable conflict, because while the LHWCA anti-alienation provision, 33 U.S.C. § 916, prohibits garnishment of LHWCA benefits, the SSA garnishment provision permits garnishment of "moneys (the entitlement to which is based upon remuneration for employment) due from, or payable by, the United States . . . to any individual." The SSA provision also defined "remuneration for employment" to include

United States District Court
Northern District of California

1   "worker's compensation benefits paid or payable under Federal or State law." *Id*. at 1120, 1121

2   (emphasis removed) (quoting 42 U.S.C. § 659(a), (h)).  The court examined the plain language of

3   the SSA provision and its legislative history, which included a statement that the SSA provision

4   "applies to '*payments under . . . the Longshoremen's and Harbor Workers' Compensation Act* (but

5   only in cases where the payments are made by the United States)." *Id*. at 1121 (emphasis in

6   original) (quotation omitted).  It concluded that both the plain language and the legislative history

7   of the statute "demonstrate[d] the legislature's 'clear and manifest' intent to repeal the LHWCA

8   Anti-Alienation provision when it enacted the SSA Garnishment provision." *Id*. at 1124.

9       Here, Plaintiffs do not specifically identify any irreconcilable conflict between JASTA and

10  the CDA in their opposition.  *See* Opp'n 4, 17.  Instead, they argue that JASTA's express

11  statement of purpose is "to provide civil litigants with the broadest possible basis, consistent with

12  the Constitution of the United States," to seek relief against those who provide material support to

13  terrorists.  Plaintiffs contend that this language conveys Congress's "clear expression that any

14  other limitation on the Antiterrorism Act . . . is abrogated," including every possible statutory

15  immunity.  [Docket No. 105 (July 27, 2017 Hr'g Tr.) 8-9.]  According to Plaintiffs, Congress

16  could have stated its intention that civil ATA claims should be given the "broadest possible"

17  application "consistent with the Constitution *and laws* of the United States," but did not.  Per

18  Plaintiffs, this should be interpreted to mean that any existing immunity law, short of what may be

19  in the Constitution itself, cannot bar an ATA claim.  Opp'n 4 (emphasis in original); *see also* Hr'g

20  Tr. 9.  Plaintiffs' indirect repeal argument rests solely on the phrase "consistent with the

21  Constitution of the United States" contained in JASTA's statement of purpose.  They do not offer

22  any legislative history or other support for their sweeping argument that JASTA expresses

23  Congress's intent to abrogate *all* statutory immunities for ATA claims, including section 230.

24      Plaintiffs' argument is not well taken.  JASTA does not reference any portion of the CDA

25  either directly or indirectly, nor does it address the responsibilities of or protections for interactive

26  computer service providers.  JASTA thus evinces no "clear and manifest" congressional intent to

27  repeal any part of the CDA.  In contrast, JASTA expressly amended the FSIA to modify the

28  immunity provision of that particular statute.  FSIA provides, "with specified exceptions, that a

United States District Court
Northern District of California

10

1    'foreign state shall be immune from the jurisdiction of the courts of the United States and of the

2    States.'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct.

3    1312, 1316 (2017) (quoting 28 U.S.C. § 1604). JASTA modified the FSIA to add 28 U.S.C. §

4    1605B, which allows claims for damages against foreign states in any case "in which money

5    damages are sought against a foreign state for personal injury or death occurring in the United

6    States" caused by "the tortious act or omission of that foreign state" on U.S. soil. *See* 28 U.S.C. §

7    1605B(b); JASTA § 3(a) (adding 28 U.S.C. § 1605B, "Responsibility of foreign states for

8    international terrorism against the United States"). Under this provision, victims of terrorism in

9    the United States can bring claims against foreign states regardless of whether they were

10   designated as a "state sponsor of terrorism" at the time of the terrorist act. *Compare* 28 U.S.C. §

11   1605B(b) *with* 28 U.S.C. § 1605A(a)(2)(A)(i)(I) (requiring that foreign state have been designated

12   as a state sponsor of terrorism at the time of the act "or was so designated as a result of such act").

13   This demonstrates that where Congress intended JASTA to repeal existing statutory immunities, it

14   made that clear.

15        Plaintiffs did not provide an analysis of JASTA's legislative history, and the court's own

16   review did not reveal any support for Plaintiffs' far-reaching interpretation. The legislative history

17   contains no evidence that Congress contemplated that JASTA would abrogate any statutory

18   immunities other the immunity afforded by the FSIA. Instead, JASTA's history, including

19   statements by members of Congress, reflects Congress's clear intent to provide an exception to the

20   FSIA's presumptive immunity for foreign states in order "to hold foreign sponsors of terrorism

21   that target the United States accountable in Federal courts." *See* 160 Cong. Rec. S6657-01, 2014

22   WL 7001951, at *S6659 (Dec. 11, 2014). As JASTA co-sponsoring Senators Charles Schumer

23   and John Cornyn explained, the purpose of JASTA was to close a "loophole" in the FSIA that

24   resulted in the dismissal of claims by the family members of the victims of the September 11,

25   2001 attacks in New York against foreign entities that allegedly funded the attacks. *See id.*; *see*

26   *also* 162 Cong. Rec. S2845-01, 2016 WL 2888818, at *S2845 (May 17, 2016) (explaining

27   legislation would enable "Americans and their family members who lost loved ones on

28   [September 11, 2011] to pursue their claims for justice against those who sponsored those acts of

United States District Court
Northern District of California

1    terrorism on U.S. homeland.").  The discussion of the provision of JASTA that amended the ATA

2    was fairly limited, and nothing in the legislative history supports the conclusion that Congress

3    sought to eliminate all forms of statutory immunity in terrorism-related cases.[3]

4          It is also worth noting that Plaintiffs' argument relies not on the substantive provisions of

5    JASTA, but on uncodified language setting forth its statement of purpose.  *See* JASTA § 2(b).  It

6    is well settled that prefatory clauses or statements of purpose do not change the plain meaning of

7    an operative clause.  *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016)

8    (citing *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889)); *see also Hawaii v. Office of*

9    *Hawaiian Affairs*, 556 U.S. 163, 173-76 (2009) (holding that preambular "whereas" clauses did

10   not create substantive rights, and emphasizing that "repeals by implication are not favored and will

11   not be presumed unless the intention of the legislature to repeal [is] clear and manifest.").  In short,

12   JASTA's statement of purpose "cannot bear the weight" that Plaintiffs place on it.  *See Hawaii*,

13   556 U.S. at 175.

14         The court concludes that JASTA did not repeal section 230(c)(1).

15   **C.      Extraterritorial Application of Section 230(c)(1)**

16         Plaintiffs also argue that section 230(c)(1) immunity does not arise because the CDA does

17   not apply outside the territorial jurisdiction of the United States.  According to Plaintiffs, Google

18   provided support and resources to ISIS outside the United States, in Europe and the Middle East;

19   ISIS's use of Google's resources was outside the United States; and the Paris attacks and

20   Gonzalez's death took place outside the United States.  Therefore, Plaintiffs argue, Google may

21   not rely on section 230(c)(1).  Opp'n 19.

22         The "presumption against extraterritoriality" of United States law mandates that "[a]bsent

23   clearly expressed congressional intent to the contrary, federal laws will be construed to have only

24   domestic application."  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (citing

---

[3] For example, Representative Chris Smith described the provision of JASTA that amended the ATA as "open[ing] *foreign officials* to accountability to so-called secondary liability, such as aiding and abetting or conspiring with terrorist perpetrators."  162 Cong. Rec. H5239-03, 2016 WL 4718240, at *H5244 (Sept. 9, 2016) (emphasis added).

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).  Courts must use a "two-step

2    framework for analyzing extraterritoriality issues." *Id*. at 2101.  First, the court must determine

3    "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute

4    gives a clear, affirmative indication that it applies extraterritorially." *Id*.  "If the statute is not

5    extraterritorial, then at the second step [courts] determine whether the case involves a domestic

6    application of the statute . . . by looking to the statute's 'focus,'" *id*., defined as the "objects of the

7    statute's solicitude." *Morrison*, 561 U.S. at 267.  "If the conduct relevant to the statute's focus

8    occurred in the United States, then the case involves a permissible domestic application even if

9    other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign

10   country, then the case involves an impermissible extraterritorial application regardless of any other

11   conduct that occurred in U.S. territory." *RJR Nabisco*, 136 S. Ct. at 2101.

12          At step one, the court agrees with Plaintiffs that the CDA does not contain "a clear,

13   affirmative indication that it applies extraterritorially." *Id*.  Therefore, the court must determine at

14   step two whether this case involves a domestic application of the CDA.  To do so, the court must

15   determine whether the conduct relevant to the statute's focus occurred in the United States or

16   abroad. *Id*.

17          The court in *Cohen v. Facebook, Inc.*, ---F. Supp. 3d---, Nos. 16-CV-4453 (NGG) (LB),

18   16-CV-5158 (NGG) (LB), 2017 WL 2192621, at *13-15 (E.D.N.Y. May 18, 2017), recently

19   examined the exact question presented here, that is, whether section 230(c)(1) can be applied to

20   conduct occurring outside of the United States.  *Cohen* examined the statute under the *RJR*

21   *Nabisco/Morrison* framework.  Considering the text and context of section 230(c)(1), it

22   determined that the focus of section 230(c)(1)'s solicitude is "its limitation on liability." *Id*. at

23   *14.  The *Cohen* court noted that "[s]ection 230(c)(1) offers only one directive—that qualifying

24   defendants may not be treated as the 'publisher or speaker of any' third party content—which it

25   does not cabin based on either the location of the content provider or the user or provider of the

26   interactive computer service." *Id*. (citing 47 U.S.C. § 230(c)(1)).  Applying relevant Second

27   Circuit law, *Cohen* then assessed the "relevant territorial events and relationships that bear on that

28   focus," considering whether those events and relationships "occurred domestically or abroad with

13

United States District Court
Northern District of California

1   respect to the challenged application of the statute." *Id*. at *13 (quoting *Matter of a Warrant to*

2   *Search a Certain E-Mail Account Controlled & Maintained by Microsoft Corp*., 829 F.3d 197,

3   216 (2d Cir. 2016)). *Cohen* concluded that in light of section 230(c)(1)'s focus on limiting civil

4   liability, "the relevant location is that where the grant of immunity is applied, i.e. the situs of the

5   litigation." *Id*. at *15.  Specifically, the court found that "[g]iven the statutory focus on limiting

6   liability, . . .  the location of the relevant 'territorial events' or 'relationships' cannot be the place

7   in which the claims arise but instead must be where redress is sought and immunity is needed,"

8   i.e., in the United States.  *Id*.

9        The court agrees with *Cohen* that the focus of section 230(c)(1) is "limiting civil liability."

10  *See id*. at *15.[4]  In enacting section 230, Congress "chose[] to treat cyberspace differently" from

11  information providers such as newspapers, magazines, and television and radio stations, "all of

12  which may be held liable for publishing or distributing obscene or defamatory material written or

13  prepared by others."  *Batzel*, 333 F.3d at 1026-27 (quotation omitted).  Congress made this choice

14  for two primary reasons: "to encourage the unfettered and unregulated development of free speech

15  on the Internet, and to promote the development of e-commerce," and "to encourage interactive

16  computer services and users of such services to self-police the Internet for obscenity and other

17  offensive material, so as to aid parents in limiting their children's access to such material."  *Id*. at

18  1027-28; *see also* 47 U.S.C. § 230(a)(4) ("[t]he Internet and other interactive computer services

19  have flourished, to the benefit of all Americans, with a minimum of government regulation.").  To

20

21  [4] At oral argument, Plaintiffs for the first time argued that in determining the statute's focus for
    purposes of the two-step extraterritorial inquiry, the court must look at the entire statute, and not
22  just the subsection at issue here.  According to Plaintiffs, the focus of the entire CDA is
    "regulation of speech" on the internet, and the immunity provided in section 230(c)(1) is merely
23  "tangential[]."  [Docket No. 105 (Hr'g Tr.) 27.]  However, Plaintiffs did not brief this argument in
    their opposition.  That alone is reason to ignore it.  Moreover, the basis for their position is
24  unclear.  Congress enacted the CDA as Title V of the Telecommunications Act of 1996.  Pub. L.
    104-104, 110 Stat. 56 (Feb. 8, 1996).  The CDA included multiple anti-indecency and anti-
25  obscenity provisions or amendments to existing law, including criminal prohibitions against "the
    knowing transmission of obscene or indecent messages to any recipient under 18 years of age" and
26  "the knowing sending or displaying of patently offensive messages in a manner that is available to
    a person under 18 years of age."  *See Reno v. ACLU*, 521 U.S. 844, 859-860 (1997) (discussing 47
27  U.S.C. §§ 223(a), (d)).  In asserting that the court must "look at the whole statute," (Hr'g Tr. 27),
    Plaintiffs did not explain whether they are referring to the entire CDA as enacted in 1996,
28  including its criminal provisions, or to anything else.  The court is not obligated to entertain an
    unbriefed argument, nor is it inclined to try to figure out what Plaintiffs are arguing.

those ends, the *only* substantive provisions of section 230 are section 230(c), which gives

providers and users of interactive computer services two types of protection from civil liability,

and section 230(d), which requires interactive computer service providers to notify customers of

commercially available parental control protections.  As the court in *Cohen* recognized, the

immunities in section 230(c) "were adopted specifically for the purpose of clarifying—and

curtailing—the scope of internet-providing defendants' exposure to liability predicated on third

party content, and much of the surrounding statutory language emphasizes and supports this

focus."  2017 WL 2192621, at *14; *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th

Cir. 1997) ("Section 230 was enacted, in part, to maintain the robust nature of Internet

communication and, accordingly, to keep government interference in the medium to a minimum. .

. . Congress made a policy choice . . . not to deter harmful online speech through the separate route

of imposing tort liability on companies that serve as intermediaries for other parties' potentially

injurious messages.").  In other words, the immunities in section 230(c) are far from tangential;

they are one of the means by which Congress "sought to further First Amendment and e-

commerce interests on the Internet while also promoting the protection of minors." *Batzel*, 333

F.3d at 1028.

Given section 230's focus on limiting civil liability, the location of the conduct relevant to

that focus "must be where redress is sought and immunity is needed," *Cohen*, 2017 WL 2192621,

at *15, i.e., through this litigation, which is in this district.  Accordingly, the court rejects

Plaintiffs' claim that Google may not invoke section 230(c)(1)'s immunity on the ground that it

requires extraterritorial application of the statute.[5]

---

[5] Plaintiffs also argue in a footnote that their ATA claims are not subject to section 230(c)(1) because of 47 U.S.C. § 230(e)(1), which states that "[n]othing in [section 230] shall be construed to impair the enforcement of . . . any . . . Federal criminal statute."  Opp'n 18 n.8.  Plaintiffs make a convoluted argument that Congress intended the ATA to provide a private means of enforcing federal criminal antiterrorism statutes, and thus the terms of the CDA exempt its application to ATA claims.  In other words, Plaintiffs appear to contend that the ATA's civil suit provision is part of the "enforcement" of a federal criminal statute, and thus falls outside section 230(c)(1)'s protections, in accordance with section 230(e)(1).  This argument has been considered and rejected by other courts.  For example, in *Jane Doe 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016), the First Circuit held that "[t]he plain-language reading of section 230(e)(1)'s reference to 'the enforcement of . . . any . . . Federal criminal statute' dictates a meaning opposite to that ascribed by the appellants: such a reading excludes civil suits."  *See also Cohen*, 2017 WL

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The court now turns to the question of whether section 230(c)(1) immunity applies to

2  Plaintiffs' claims.

3    **D.    Immunity Under Section 230(c)(1)**

4    Google argues that section 230(c)(1) blocks all of Plaintiffs' claims.  As noted, section

5  230(c)(1) protects from liability "(a) a provider or user of an interactive computer service (b) that

6  the plaintiff seeks to treat as a publisher or speaker (c) of information provided by another

7  information content provider." *Fields*, 200 F. Supp. 3d at 969.  Google argues that this test is

8  satisfied here, because Google is a provider of interactive computer services, Plaintiffs' claims

9  seek to treat Google as a publisher, and the content at issue—ISIS videos—was provided by third

10  parties.

11    Plaintiffs do not dispute that Google is an interactive computer service provider.  However,

12  they argue that the second and third elements of section 230(c)(1) immunity are not met, because

13  they do not seek to treat Google as a publisher or speaker, and the information at issue was

14  provided by Google rather than another information content provider.

15    **1.    Whether Plaintiffs Seek to Treat Google as a Publisher or Speaker**

16    Google argues that it is entitled to section 230(c)(1) immunity because Plaintiffs' claims

17  seek to hold Google liable as the "publisher or speaker" of ISIS's YouTube videos.  Plaintiffs

18  counter that their lawsuit does not depend on the characterization of Google as the publisher or

19  speaker of ISIS's content, because their claims focus on Google's violations of the ATA and

20  federal criminal statutes that bar the provision of material support to terrorists.  Opp'n 18.

21    The Ninth Circuit has instructed that in examining whether section 230(c) immunity

22  applies to a particular claim, "what matters is not the name of the cause of action—defamation

23  versus negligence versus intentional infliction of emotional distress—what matters is whether the

24  cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of

25  content provided by another." *Barnes*, 570 F.3d at 1101-02.  While "the cause of action most

26

27  2192621, at *12 n.11 (concluding that section 230(e)(1) "does not limit Section 230(c)(1)
   immunity in civil actions based on criminal statutes but rather extends only to criminal
28  prosecutions," collecting cases).

1    frequently associated with the cases on section 230 is defamation, . . . the language of the statute

2    does not limit its application to defamation cases." *Id.* at 1101 (citations omitted).  "[C]ourts must

3    ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's

4    status or conduct as a 'publisher or speaker.'  If it does, section 230(c)(1) precludes liability." *Id*.

5    at 1102.  "This guidance emphasizes that Section 230(c)(1) is implicated not only by claims that

6    explicitly point to third party content but also by claims which, though artfully pleaded to avoid

7    direct reference, implicitly require recourse to that content to establish liability or implicate a

8    defendant's role, broadly defined, in publishing or excluding third party [c]ommunications."

9    *Cohen*, 2017 WL 2192621, at *11 (discussing *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 175

10   (2d Cir. 2016) (quoting *Barnes*, 570 F.3d at 1102)).

11          Here, the SAC alleges that Google "knowingly provided" ISIS with access to YouTube,

12   allowing it to use the platform and services "as a powerful tool for terrorism" by permitting it to

13   post videos to spread propaganda, recruit followers, and plan and carry out attacks.  SAC ¶¶ 12,

14   13, 21.  Plaintiffs further allege that Google "refuse[d] to actively identify ISIS YouTube

15   accounts" or to make "substantial or sustained efforts to ensure that ISIS would not re-establish

16   the accounts using new identifiers."  *Id*. at ¶¶ 20, 427, 429.  According to Google, Plaintiffs'

17   theory is that "Google permitted third parties to publish harmful material on its service and failed

18   to do enough to remove that content and the users responsible for posting it."  Mot. 12.  This

19   theory, Google argues, targets its "'traditional editorial functions'—decisions regarding 'whether

20   to publish, withdraw, postpone, or alter content.'"  Mot. 12 (quoting *Jones v. Dirty World Entm't*

21   *Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014)).  Google contends that these functions are

22   "precisely the kind of activity for which Congress intended to grant absolution with the passage of

23   section 230."  *Roommates*, 521 F.3d at 1171-72 ("any activity that can be boiled down to deciding

24   whether to exclude material that third parties seek to post online is perforce immune under section

25   230."); *Batzel*, 333 F.3d at 1031 ("the exclusion of 'publisher' liability necessarily precludes

26   liability for exercising the usual prerogative of publishers to choose among proffered material").

27          In response, Plaintiffs deny that their claims are dependent upon content posted by ISIS or

28   its operatives.  They argue that their claims are based upon the fact that Google provides ISIS

United States District Court
Northern District of California

17

1    followers with access to powerful tools and equipment to publish their own content.  These tools

2    include expert assistance, communications equipment, and personnel.  Opp'n 18.  Plaintiffs assert

3    that they challenge Google's provision of the means for ISIS followers to self-publish content,

4    rather than challenging the actual content itself.

5           This argument essentially tries to divorce ISIS's offensive content from the ability to post

6    such content.  However, Plaintiffs' parsing of means and content is utterly inconsistent with their

7    allegations in the SAC.  Plaintiffs do not allege that they have been harmed by the mere provision

8    of the YouTube platform to ISIS.  Instead, they allege that "ISIS uses YouTube as a tool and a

9    weapon of terrorism," and that ISIS recruits, plans, incites, instructs, threatens, and communicates

10   its terror message on YouTube.  SAC ¶¶ 148, 150.  The SAC is replete with detailed descriptions

11   of the actual content that ISIS has posted on YouTube in furtherance of its terrorist activity,

12   including over 15 pages of allegations of "ISIS's extensive use of Google's services" to

13   disseminate its terrorist message.  SAC 23-40.  In this way, Plaintiffs' claims are inextricably

14   bound up with the content of ISIS's postings, since their allegations describe a theory of liability

15   based on the "essential" role that YouTube has played "in the rise of ISIS to become the most

16   feared terrorist organization in the world."  *Id*. at ¶¶ 139, 238 ("Google's Services have played an

17   essential role in enabling ISIS to grow, develop, and project itself as the most feared terrorist

18   organization in the world.").

19          Moreover, like the plaintiffs in *Cohen*, Plaintiffs "rely on content to establish causation,"

20   thus undercutting their argument that their claims do not seek to treat Google as a publisher of

21   information.  *See Cohen*, 2017 WL 2192621, at *13.  Plaintiffs' claims are not premised solely on

22   the theory that Google provided a publishing or communication platform to ISIS; they are further

23   grounded in the allegation that Google failed to prevent ISIS from using YouTube to transmit its

24   hateful message, which resulted in great harm.  *See* SAC at ¶¶ 139, 147, 245 ("YouTube enables

25   ISIS to communicate its messages directly to intended audiences"; YouTube enabled ISIS "to

26   facilitate and accomplish" the Paris attacks).  As the *Cohen* court observed, Google's "role in

27   publishing that content is thus an essential causal element" of Plaintiffs' claims, and "allowing

28   liability to be imposed on that basis would 'inherently require[] the court to treat the defendant as

18

United States District Court
Northern District of California

the publisher or speaker of content provided by'" ISIS.  2017 WL 2192621, at *13.  If the court were to apply Plaintiffs' logic and ignore the content of any ISIS-related YouTube postings in construing Plaintiffs' claims, it would be impossible to discern a causal basis for Google's alleged responsibility for the terrorist attacks.

Plaintiffs' "means rather than content" argument is nearly identical to the one advanced in *Fields*, where the plaintiffs asserted that their claims were not based on the contents of tweets or the failure to remove tweets, but were instead based on "Twitter's 'provision of Twitter accounts to ISIS in the first place.'" 200 F. Supp. 3d at 970; *Fields v. Twitter*, 217 F. Supp. 3d 1116, 1120 (N.D. Cal. 2016) ("*Fields II*").  The *Fields* court rejected this argument, holding that "providing accounts to ISIS is publishing activity, just like monitoring, reviewing, and editing content." *Fields II*, 217 F. Supp. 3d at 1123.  It noted that "[a] policy that selectively prohibits ISIS members from opening accounts would necessarily be content based as Twitter could not possibly identify ISIS members without analyzing some speech, idea or content expressed by the would-be account holder: i.e., 'I am associated with ISIS.'"  *Id*.  Like the plaintiffs in *Fields*, Plaintiffs in this case attempt to penalize a publishing decision by imposing liability on Google for failing to prevent ISIS followers from using YouTube.  The alleged wrongdoing challenged by Plaintiffs is "the decision to permit third parties to post content."  *Fields*, 200 F. Supp. 3d at 972.  As such, Plaintiffs seek to treat Google as the publisher of ISIS's video content.

Plaintiffs offer a second argument to support their position that they are not suing Google in its capacity as a publisher or speaker of third party content.  This contention is based on the "functionality" that Google provides to YouTube users.  Plaintiffs argue that Google provides proprietary functions that are not "traditional publishing" activities.  These functions enhance ISIS's ability to conduct operations; they include allowing accounts that are taken down to rapidly "reconstitute" by permitting bulk friend/follow requests, and failing to take steps to minimize or mitigate "incremental naming" of accounts.  Opp'n 20-21.  Plaintiffs assert that the use of these functions is "suspicious *conduct* that is easily detectable and prevented by Google."  *Id*. at 21 (emphasis in original); *see also* Hr'g Tr. 41.  According to Plaintiffs, placing limitations on this conduct is not content-specific, and therefore, does not implicate Google's role as a publisher of

1   content.

2        This argument, too, fails, because it seeks to impose liability on Google for allowing users

3   to reconstitute or recreate accounts which Google has already chosen to disable.  As the Ninth

4   Circuit has recognized, this is precisely the result Congress sought to avoid when it enacted

5   section 230 and provided protection for websites "against the evil of liability for failure to remove

6   offensive content":

> Section 230 was prompted by a state court case holding Prodigy
> responsible for a libelous message posted on one of its financial
> message boards. *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.,*
> 1995 WL 323710 (N.Y.Sup.Ct. May 24, 1995) (unpublished). The
> court there found that Prodigy had become a "publisher" under state
> law because it voluntarily deleted some messages from its message
> boards "on the basis of offensiveness and 'bad taste,'" and was
> therefore legally responsible for the content of defamatory messages
> that it failed to delete. *Id.* at *4. The *Stratton Oakmont* court
> reasoned that Prodigy's decision to perform some voluntary self-
> policing made it akin to a newspaper publisher, and thus responsible
> for messages on its bulletin board that defamed third parties. The
> court distinguished Prodigy from CompuServe, which had been
> released from liability in a similar defamation case because
> CompuServe "had no opportunity to review the contents of the
> publication at issue before it was uploaded into CompuServe's
> computer banks." *Id.*; *see Cubby, Inc. v. CompuServe, Inc.,* 776
> F.Supp. 135, 140 (S.D.N.Y. 1991). Under the reasoning of *Stratton
> Oakmont,* online service providers that voluntarily filter some
> messages become liable for all messages transmitted, whereas
> providers that bury their heads in the sand and ignore problematic
> posts altogether escape liability. Prodigy claimed that the "sheer
> volume" of message board postings it received—at the time, over
> 60,000 a day—made manual review of every message impossible;
> thus, if it were forced to choose between taking responsibility for all
> messages and deleting no messages at all, it would have to choose
> the latter course. *Stratton Oakmont,* 1995 WL 323710 at *3.

21   *Roommates*, 521 F.3d at 1163, 1174.  The Ninth Circuit explained that in enacting section 230,

22   "Congress sought to spare interactive computer services this grim choice by allowing them to

23   perform some editing on user-generated content without thereby becoming liable for all

24   defamatory or otherwise unlawful messages that they didn't edit or delete." *Id.*  "In other words,

25   Congress sought to immunize the *removal* of user-generated content, not the *creation* of content . .

26   ." *Id.* (emphasis in original).  Under Plaintiffs' theory, Google would be penalized for the act of

27   policing YouTube by removing problematic or ISIS-related accounts that users are then able to

28

United States District Court
Northern District of California

1   immediately regenerate.[6]  This "policing" falls within the purview of a publisher.

2     Notably, the court in *Cohen* rejected a similar theory asserted by the plaintiffs, who sought

3   to hold Facebook liable for "'provision of services' to Hamas in the form of account access

4   'coupled with Facebook's refusal to use available resources . . . to identify and shut down Hamas

5   [] accounts.'"  2017 WL 2192621, at *12.  The court held that "[w]hile superficially content-

6   neutral, this attempt to draw a narrow distinction between policing accounts and policing content

7   must ultimately be rejected.  Facebook's choices as to who may use its platform are inherently

8   bound up in its decisions as to what may be said on its platform, and so liability imposed based on

9   its failure to remove users would equally 'derive[ ] from [Facebook's] status or conduct as a

10  'publisher or speaker.'"  *Id.* (quoting *LeadClick*, 838 F.3d at 175).  This court agrees with the

11  reasoning in *Cohen*.  Plaintiffs seek to hold Google liable for failing to adopt a strategy to defeat

12  activity such as account reconstitution and bulk friend/follow requests; to the extent the objective

13  of such a strategy is to control *who* can publish content, section 230(c)(1) immunizes Google's

14  decision not to adopt that strategy.  The Ninth Circuit has made clear that "any activity that can be

15  boiled down to deciding whether to exclude material that third parties seek to post online is

16  perforce immune under section 230."  *Roommates*, 521 F.3d at 1170-71; *see also Doe v. MySpace,*

17  *Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and

18  deletion of content . . . [are] actions quintessentially related to a publisher's role." (quotation

19  omitted)).

20    For the reasons above, the court concludes that Plaintiffs' claims seek to treat Google as

21  the publisher or speaker of ISIS's YouTube videos.

22      **2.**   **Whether Google Is an Information Content Provider**

23    Finally, Google argues that it is not an "information content provider" because third parties

24  created and posted the offending content at issue on YouTube, and not Google.  The CDA defines

25

26              

27  [6] This argument also appears to implicate the specific immunity afforded by section 230(c)(2), which provides in relevant part that interactive computer service providers and users shall not be held liable for "any action voluntarily taken in good faith to restrict access to or availability of

28  material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . ."  47 U.S.C. § 230(c)(2)(A).

United States District Court
Northern District of California

1   "information content provider" as "any person or entity that is responsible, in whole or in part, for

2   the creation or development of information provided through the Internet or any other interactive

3   computer service."  47 U.S.C. § 230(f)(3).  While a website operator like Google can be both an

4   "interactive computer service" and an "information content provider," *Roommates*, 521 F.3d at

5   1162, "[t]he critical issue is whether . . . [the interactive computer service] acts as an information

6   content provider with respect to the information" at issue.  *Carafano v. Metrosplash.com, Inc.*, 339

7   F.3d 1119, 1125 (quotation omitted).

8          Plaintiffs argue that Google acts as an "information content provider" by placing targeted

9   ads.  According to Plaintiffs, Google selects an ad to be displayed alongside user content based on

10  information it gathers about the viewer and the posting, thus creating "new unique content" in the

11  form of a composite page for specific viewers.  FAC ¶¶ 460-461.  This specifically-created content

12  is intended "to capture [a viewer's] attention" and keep the viewer on the page longer.  Hr'g Tr.

13  58.  In this way, Plaintiffs assert, Google's conduct exceeds the scope of immunity provided by

14  section 230(c)(1), because Google thereby "enters into the unprotected world of content creators."

15  Opp'n 23.

16         This theory finds no support in the case law.  In *Roommates*, which is controlling Ninth

17  Circuit authority, the court interpreted the term "development" as used in the section 230(f)(3)

18  definition of "information content provider" "as referring not merely to augmenting the content

19  generally, but to materially contributing to its alleged unlawfulness."  521 F.3d at 1167-68.  "In

20  other words, a website helps to develop unlawful content, and thus falls within the exception to

21  section 230 [immunity], if it contributes materially to the alleged illegality of the conduct."  *Id*. at

22  1168.  In *Jones*, 755 F.3d at 410, the Sixth Circuit adopted the definition of "development" from

23  *Roommates* and held that "[a] material contribution to the alleged illegality of the content does not

24  mean merely taking action that is necessary to the display of allegedly illegal content.  Rather, it

25  means being responsible for what makes the displayed content allegedly unlawful."

26         Here, Plaintiffs do not allege that Google "materially contribut[ed]" in any way to the

27  actual content of ISIS's YouTube videos.  They do not claim that Google's ads (which are

28  themselves third-party content) are objectionable, or that the ads played any role in making ISIS's

United States District Court
Northern District of California

22

terrorist videos unlawful.  For example, Plaintiffs do not allege that any ads paired with ISIS-related content offered tools or instructions on how to carry out ISIS's threats, or otherwise encouraged individuals to commit acts of terrorism.  The SAC contains only one screenshot example of an alleged targeted ad next to an ISIS video on YouTube; the screenshot shows an advertisement for a product called "ThreatMetrix Cybercrime Report: Q4 2015."  SAC ¶ 458.  Plaintiffs do not make any allegations about the relationship between this product and terrorism.  *See, e.g., Jones*, 755 F.3d at 416-17 (holding interactive service provider was not information content provider as to allegedly defamatory third party posts; even though provider appended his own comments to the posts, the plaintiff did not allege that the provider's comments were themselves defamatory).

Nor do Plaintiffs suggest that Google's targeted ad algorithm is anything but content neutral.  Notably, the court in *Roommates* distinguished between a website that merely provides "neutral tools" that may be used by third parties to post unlawful content, and a website that "both elicits the allegedly illegal content and makes aggressive use of it in conducting its business."  521 F.3d at 1171-72.  The court held that a search engine's provision of "neutral tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception."  *Id*. at 1169.  So too here.  Google's provision of neutral tools, including targeted advertising, does not equate to content development under section 230, because as currently alleged, the tools do not encourage the posting of unlawful or objectionable material.  *See id*. at 1171-72.

At the hearing, Plaintiffs suggested for the first time that the *Roommates* "material contribution" test does not apply because the *Roommates* court was not considering the exact question presented here, which is whether targeted advertising is a form of content development.  Hr'g Tr. 59-60.  Plaintiffs assert that the issue of "strategically combining third party content" presents a matter of first impression, and that "precedent supports a conclusion that Google's actions [in targeting ads] overstep traditional editorial and publishing functions."  Opp'n 23.  In support, Plaintiffs cite *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. Civ.A.3:02-CV-2727-G, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004).  However, the facts of that case bear little

23

United States District Court
Northern District of California

1  resemblance to Google's alleged actions here.  In *MCW*, the website at issue was a consumer

2  complaint forum.  The defendants, one of which operated the website, did not dispute that they

3  "themselves create[d], develop[ed], and post[ed] original, defamatory information" regarding the

4  plaintiff, nor did they dispute that they "personally [wrote] and create[d] numerous disparaging

5  and defamatory messages about [the plaintiff] in the form of report titles and various headings,"

6  such as "Con Artists," "Scam," "Ripoff," and "Corrupt Companies."  *Id*. at \*9, n.11.  Additionally,

7  the defendants actively encouraged a consumer to take certain photos depicting the plaintiff's

8  company name so that they could be included on the website.  *Id*. at \*10.  Based on these facts, the

9  court concluded that the defendant website had acted as an "information content provider" with

10  respect to some of the defamatory information on their site and could not claim § 230(c)(1)

11  immunity.  *Id*.  In contrast with the defendant in *MCW*, Plaintiffs do not allege that Google created

12  any content that was itself objectionable or unlawful.

13      Plaintiffs provide no support for their position that *Roommates* does not apply here.  The

14  rule announced in *Roommates*, that a website operator is responsible for creating or developing

15  content within the meaning of section 230(f)(3) if it "materially contribut[es] to [the content's]

16  alleged unlawfulness," 521 F.3d at 1167-68, was not limited to the facts of that case.  Courts have

17  applied the material contribution test in various factual scenarios.  For example, the Sixth Circuit's

18  2014 decision in *Jones* is instructive.  In *Jones*, the court adopted and applied the *Roommates* test

19  to determine whether the operator of an interactive service provider was a content developer under

20  section 230(f)(3) where he selected allegedly defamatory statements for online publication,

21  appended commentary to the postings, and refused to remove them upon request.  755 F.3d at 415-

22  16.  The court observed that the "crucial distinction" for determining what constitutes

23  "development" in section 230(f)(3) is "on the one hand, taking actions (traditional to publishers)

24  that are necessary to the display of unwelcome and actionable content and, on the other hand,

25  responsibility for what makes the displayed content illegal or actionable."  *Id*. at 414.  It concluded

26  that the defendant was an information content provider as to his own comments, but that his

27  comments, which were not themselves challenged as defamatory, did not materially contribute to

28  the defamatory content of the challenged statements.  *Id*. at 416-17.  It also noted that the

24

United States District Court
Northern District of California

1    defendant's provision of neutral tools for third parties to use to submit information did not

2    constitute a material contribution to any defamatory speech that had been uploaded by third

3    parties.  *Id*. at 416; *see also id*. at 412-13 (discussing cases adopting and applying material

4    contribution test).  As with the interactive service provider's own commentary in *Jones*, Plaintiffs

5    do not allege that Google's own actions—here, its targeted ad algorithm—contribute in any way to

6    what makes the ISIS-related videos unlawful or objectionable.  Google's ad pairings do nothing to

7    enhance the unlawfulness of ISIS videos, encourage the posting of ISIS videos, or make posting

8    ISIS videos easier.  *See Roommates*, 521 F.3d at 1172 (discussing *Carafano*, 339 F.3d at 1124).

9         Plaintiffs also argue that by sharing advertising revenue with ISIS, Google is directly

10   contributing to ISIS's unlawful activities.  Opp'n 24.  Their argument on this point appears to be

11   that by "paying ISIS" for its videos, Google is responsible for developing and generating ISIS

12   content.  *See id*.  The case that Plaintiffs cite in support is distinguishable.  In *FTC v. Accusearch,*

13   *Inc*., 570 F.3d 1187, 1200 (10th Cir. 2009), the FTC sued a website operator that sold personal

14   data online, including telephone records which are protected from disclosure under federal law.

15   *Id*. at 1190.  The defendant asserted section 230(c)(1) immunity, stressing that its search services

16   were provided by third-party researchers.  *Id*. at 1191.  The court held that the defendant was not

17   entitled to immunity because it was an information content provider.  The court noted that the

18   defendant "solicited requests for . . . confidential information and then paid researchers to obtain

19   it" with the knowledge that "its researchers were obtaining the information through fraud or other

20   illegality."  *Id*. at 1199.  Based on these actions, the court held that the defendant "contributed

21   mightily to the unlawful conduct of its researchers," and that "the offensive postings were [the

22   defendant's] *raison d'etre* and it affirmatively solicited them."  *Id*. at 1200.  It concluded that

23   "[t]he offending content was the disclosed confidential information itself," and that the defendant

24   "was responsible for the development of that content—for the conversion of the legally protected

25   records from confidential material to publicly exposed information."  *Id*. at 1199.  Unlike the

26   defendant in *Accusearch*, the SAC does not contain any allegations that Google was responsible

27   for the development of the content of offending ISIS videos or that it actively solicited terrorist

28   videos.  Indeed, one court has held that interactive computer service providers are eligible for

25

United States District Court
Northern District of California

1  section 230(c)(1) immunity "even where the interactive service provider has an active, even

2  aggressive role in making available content prepared by others," including paying users for

3  content.  *See Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998); *see also Roommates*, 521

4  F.3d at 1185 (McKeown, J., dissenting) ("the CDA does not withhold immunity for the

5  encouragement or solicitation of information," citing *Blumenthal*, 992 F. Supp. at 52).  Therefore,

6  even accepting as true Plaintiffs' allegations that Google shares ad revenue with ISIS, such

7  conduct does not mean that Google is a content developer with respect to ISIS videos.

8      At the hearing, Plaintiffs also asserted that the allegation that Google shared ad revenue

9  with members of ISIS does not implicate the content of YouTube postings or Google's role as a

10  publisher in any way, since revenue sharing with ISIS is itself the provision of material support.

11  Hr'g Tr. 72 ("you can't share money with a terrorist.").  However, to the extent Plaintiffs seek to

12  proceed on this theory, it is not pleaded in the SAC.  Although the SAC highlights one example of

13  Google placing a targeted ad with an ISIS video on YouTube, there is no allegation that any

14  revenue was actually shared with the user who posted the video.  *See* SAC ¶ 458.  There is also no

15  allegation that the user who uploaded the video is a member of ISIS, and no allegations connecting

16  alleged revenue sharing with the Paris attacks.

17      Section 230(c)(1) "precludes treatment as a publisher or speaker for '*any* information

18  provided by *another* information content provider.'"  *Carafano*, 339 F.3d at 1125 (emphasis in

19  original) (quoting 47 U.S.C. § 230(c)(1)).  "The critical issue is whether . . . [the interactive

20  computer service] acts as an information content provider with respect to the information" at issue.

21  *Id*. (quotation omitted).  Here, the SAC does not allege that Google acted as an "information

22  content provider" with respect to the information at issue, i.e., the offending ISIS videos.

23  Accordingly, Google satisfies the third element of section 230(c)(1) immunity.  Plaintiffs' claims

24  fall within the scope of section 230(c)(1)'s grant of immunity and are therefore barred.[7]

25      It is an abuse of discretion for a district court to refuse to grant leave to amend a complaint

26  in the absence of an "apparent" reason, such as undue delay, bad faith or dilatory motive,

27

28  ───────────────
[7] Because the court concludes that section 230(c)(1) bars Plaintiffs' claims, it does not reach the parties' arguments about the sufficiency of the claims pleaded in the SAC.

prejudice to the opposing party, futility of the amendments, or repeated failure to cure deficiencies in the complaint by prior amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lockheed Martin Corp. v. Network Sols., Inc*., 194 F.3d 980, 986 (9th Cir. 1999).  Accordingly, the SAC is dismissed with leave to amend.

## IV.    CONCLUSION

For the foregoing reasons, Google's motion to dismiss is granted in part.  Plaintiffs' SAC is dismissed with leave to amend.  Any amended complaint shall be filed within 14 days of the date of this order.

**IT IS SO ORDERED.**

Dated: October 23, 2017



Donna M. Ryu
United States Magistrate Judge